**Richard LUCAS et al., Petitioners,**

v.

**UNITED STATES of America,
Respondent.**

No. C–6181.

Supreme Court of Texas.

May 11, 1988.

Concurring Opinion of Justice Culver
May 25, 1988.

Dissenting Opinion of Chief Justice Phillips
Sept. 21, 1988.

Walter L. Boyaki, Miranda & Boyaki, El Paso, for Lucas.

Jim Mattox, Atty. Gen., Austin.

Irene M. Solet, Bruce G. Forrest, Robert S. Greenspan, Civ. Div., Appellate Staff, Helen M. Eversberg, U.S. Atty., James M. Spears, Deputy Asst. Atty. Gen., Robert S. Greenspan, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for U.S.

KILGARLIN, Justice.

This is the first case to come to us on questions certified by a federal appellate court. *See Lucas v. United States,* 807 F.2d 414 (5th Cir.1986), *questions certified,* 811 F.2d 270 (5th Cir.1987). Pursuant to Tex. Const. art. V, § 3–c, we have jurisdiction to answer the questions certified, which are as follows:

Whether the limitation on medical malpractice damages in Tex.Rev.Civ.Stat. Ann. art. 4590i §§ 11.02 and 11.03 (Vernon Supp.1986) is consistent with the Texas Constitution, and if so, whether it applies to limit the liability of each defendant rather than the recovery of each claimant.

For the reasons stated in this opinion, we answer that the damages limitations contained in sections 11.02 and 11.03 of article 4590i violate article I, § 13 of the Texas Constitution. It is therefore unnecessary for us to answer the additional question certified to us by the Fifth Circuit.

Our constitutional authority to answer questions of state law certified by federal appellate courts is of relatively recent origin. In 1985, Texas voters approved an amendment to our state constitution which became article V, section 3–c. The amendment became effective January 1, 1986, and our court thereafter promulgated an implementing rule as authorized by the constitution. *See* Tex. Const. art. V., §§ 3–c(b) and 31; Tex.R.App.P. 114. Because this is the first case to come to us under the new certification procedures, for historical purposes we will first review briefly the steps employed by this court in considering the Fifth Circuit's certification order and, ultimately, agreeing to answer the questions certified.

Upon receipt of the certified questions from the Fifth Circuit, the case was docketed and assigned a number in normal sequential order. Notice of the docketing was furnished the Attorney General, as required by Tex.R.App.P. 114(f) (the Attorney General did not intervene). Thereafter, the court, by majority vote, determined that it would accept the question and render an answer. At that time, the case

was set for oral argument and the court determined to allow Lucas, who was urging the unconstitutionality of the statute, the role of petitioner even though the United States of America was the appealing party in the Fifth Circuit. Argument in the case was allowed as in any other cause before the court.

To put the facts of this case in perspective, we quote at length from the original opinion of the Fifth Circuit:

When fourteen-month-old Christopher Lucas developed a swollen neck and a fever after a family outing, his parents took him to the William Beaumont Army Medical Center near El Paso, Texas, for diagnosis and treatment. An army doctor determined that the child had a cyst in his thyroglossal duct and ordered an injection of 600,000 units of Bicillin LA, a penicillin product manufactured and packaged in its own syringe by Wyeth Laboratories.

A hospital nurse gave Christopher the shot in his right buttock with a 1¼ " needle that was fully inserted. Christopher's father testified that he saw a thin line of blood appear in the tube containing the medication when the nurse aspirated the plunger before injecting the medication into the baby. Blood appeared at the injection site, and within a few moments, Christopher's legs became mottled. The doctors were summoned. They concluded that the baby was having an allergic reaction to the antibiotic and gave injections to combat it.

Several hours later, Christopher's parents noticed that his legs were not moving as they usually did when he cried. Tests conducted during the next several days indicated paralysis. An operation to remove a tumor suspected to be pressing on the nerves controlling the child's legs determined that the paralysis was the result of blood starvation of the nerves caused by a blockage created when the Bicillin LA was injected directly into an artery. Tragically, the paralysis is permanent.

Christopher and his parents sued the United States under the Federal Tort Claims Act. The district court held that the injection was negligently administered and awarded the parents $498,-628.72 as the present value of the past and future medical expenses they face in caring for Christopher until his majority. While the district court did not detail its calculation, the amount of the award is consistent with the total-offset method of discounting. The court also awarded to Christopher $350,000.00 as the present value of the future medical expenses he will have after his eighteenth birthday, and $600,000.00 as the present value of the impairment of his future earning capacity. Finally, the court awarded Christopher $1,500,000.00 for pain and suffering. The district court then reduced the award by the $400,000.00 paid by Weyth [sic] Labs to the Lucases in settlement of a state court suit.

The district court refused to apply Tex. Rev.Civ.Stat.Ann. art. 4590i (Vernon Supp.1986) to limit the nonmedical damages, stating that the provision did not apply to hospitals operated by the United States. In an amended judgment, the court ordered that interest on a judgment against the United States be paid only as it accrues after a claim is filed with the Comptroller General and not from the date of judgment. See 31 U.S. C. § 1304(b)(1)(A). The court awarded no damages for the parents' separate claims for pain and suffering.

*Lucas v. United States,* 807 F.2d 414, 416 (5th Cir.1986), *questions certified,* 811 F.2d 270 (5th Cir.1987).

On appeal, the Fifth Circuit held that the liability limit of article 4590i, section 11.02, does apply to federally operated hospitals and that its application was consistent with the due process and equal protection clauses of the United States Constitution. 807 F.2d at 417, 421–22; 811 F.2d at 271. Our question, then, is whether the limits of liability for health care providers set out in that statute and/or section 11.03 are consistent with the Texas Constitution. Those sections provide in pertinent part:

### Limit on Civil Liability

Sec. 11.02. (a) In an action on a health care liability claim where final

judgment is rendered against a physician or health care provider, the limit of civil liability for damages of the physician or health care provider shall be limited to an amount not to exceed $500,000.

(b) Subsection (a) of this section does not apply to the amount of damages awarded on a health care liability claim for the expenses of necessary medical, hospital, and custodial care received before judgment or required in the future for treatment of the injury.

### Alternative Partial Limit on Civil Liability

Sec. 11.03. In the event that Section 11.02(a) of this subchapter is stricken from this subchapter or is otherwise invalidated by a method other than through legislative means, the following shall become effective:

In an action on a health care liability claim where final judgment is rendered against a physician or health care provider, the limit of civil liability of the physician or health care provider for all past and future noneconomic losses recoverable by or on behalf of any injured person and/or the estate of such person, including without limitation as applicable past and future physical pain and suffering, mental anguish and suffering, consortium, disfigurement, and any other nonpecuniary damage, shall be limited to an amount not to exceed $150,000.

Tex.Rev.Civ.Stat.Ann. art. 4590i, §§ 11.02, 11.03. The limits in both sections are not absolute but instead increase or decrease depending on the consumer price index published by the federal government. *Id.* at §§ 11.01, 11.04.

At least thirteen states other than Texas have enacted damage limitation provisions into their medical malpractice statutes. Each statute has different characteristics, and the state courts have divided on the constitutionality of the various caps. *See, e.g., Smith v. Department of Insurance,* 507 So.2d 1080, 1087–89 (Fla.1987) ($450,-000 limit on noneconomic damages violated "open courts" provision of Florida Constitution); *Wright v. Central Du Page Hospital Ass'n,* 63 Ill.2d 313, 347 N.E.2d 736, 743 (1976) ($500,000 cap constituted "special law" in violation of Illinois Constitution);[1] *Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825, 836–38 (1980) ($250,000 limit on noneconomic damages violated equal protection guaranteed by New Hampshire Constitution); *Arneson v. Olson,* 270 N.W.2d 125, 135–36 (N.D.1978) ($300,000 ceiling violated equal protection clause of North Dakota Constitution); *Duren v. Suburban Community Hospital,* 24 Ohio Misc.2d 25, 482 N.E.2d 1358, 1361–63 (C.P.1985) ($200,000 limit on general damages violated Ohio and federal constitutions); *Fein v. Permanente Medical Group,* 38 Cal.3d 137, 211 Cal. Rptr. 368, 695 P.2d 665, 679–84 (1985) ($250,000 ceiling on noneconomic damages held constitutional); *Johnson v. St. Vincent Hospital, Inc.,* 273 Ind. 374, 404 N.E.2d 585, 598–601 (1980) ($500,000 cap upheld); *Sibley v. Board of Supervisors,* 462 So.2d 149, 154–58 (La.1985) ($500,000 cap upheld) *modified on reh'g,* 477 So.2d 1094, 1109–10 (La.1985) (latter opinion ordering conditional remand on state equal protection challenge); *Prendergast v. Nelson,* 199 Neb. 97, 256 N.W.2d 657, 668–69 (1977) ($500,000 cap upheld in plurality opinion joined by only three judges, with three others dissenting as to constitutionality, and one judge declining to reach constitutional issues because opinion was merely advisory). *Compare Jones v. State Board of Medicine,* 97 Idaho 859, 555 P.2d 399, 410–16 (1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977) (case remanded for fact findings pertinent to constitutional attacks on damage caps).

---

**1.** Although not necessary in light of our "open courts" holding, one wonders whether the drafters of the Texas Constitution intended for the legislature to enact special laws for the protection of specified classes of tortfeasors. *Compare* Tex. Const. art. I, § 3 ("[N]o man, or set of men, is entitled to exclusive ... privileges, but in consideration of public services.") *with* Tex.

Const. art. III, § 56 ("[I]n all other cases where a general law can be made applicable, no local or special law shall be enacted...."). A prior constitution left it to the legislature, "in its judgment," to decide when a general law could be made applicable. Tex. Const. art. XII, § 40 (1873). This language does not appear in the present constitution. Tex. Const. art. III, § 56.

In Texas, at least three courts of appeals have already struck down the damages caps provided in article 4590i. *Baptist Hospital of Southeast Texas, Inc. v. Baber,* 672 S.W.2d 296 (Tex.App.—Beaumont 1984), *writ ref'd n.r.e. per curiam,* 714 S.W.2d 310 (Tex.1986); *Brownsville Medical Center v. Gracia,* 704 S.W.2d 68, 80 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.); *Detar Hospital, Inc. v. Estrada,* 694 S.W.2d 359, 365–66 (Tex.App.—Corpus Christi 1985, no writ); *Malone & Hyde, Inc. v. Hobrecht,* 685 S.W.2d 739, 753 (Tex. App.—San Antonio 1985, writ dism'd by agr.). Another court of appeals has upheld the caps. *Rose v. Doctors Hospital Facilities,* 735 S.W.2d 244 (Tex.App.—Dallas 1987, writ granted). One federal district judge concluded that the Texas statute violates both the state and federal constitutions. *Waggoner v. Gibson,* 647 F.Supp. 1102 (N.D.Tex.1986). The certifying panel in our case, however, disagrees as to the federal constitution. *See Lucas,* 807 F.2d at 422 n. 2.

We begin our state constitutional analysis by noting the findings and purposes enumerated by the Texas Legislature in Tex.Rev.Civ.Stat.Ann. art. 4590i, § 1.02 (Vernon Supp.1987). Based on these findings and purposes, the legislature enacted the damages limitations quoted in section 11.02 and, alternatively, section 11.03. Significantly, section 11.03 on its face shows that the legislature itself entertained doubts about the constitutionality of the limit of liability set out in section 11.02(a).

We have considered the arguments for and against the constitutionality of the caps. With all respect due a legislative enactment, we nevertheless conclude that the liability limits in article 4590i, sections 11.02 and 11.03, are unconstitutional as applied to catastrophically damaged malpractice victims seeking a "remedy by due course of law." Construing article I, section 13, of the Texas Constitution, this court has said:

> In analyzing the litigant's right to redress, we first note that the litigant has two criteria to satisfy. First, it must be shown that the litigant has a cognizable common law cause of action that is being restricted. Second, the litigant must show that the restriction is unreasonable or arbitrary when balanced against the purpose and basis of the statute.

*Sax v. Votteler,* 648 S.W.2d 661, 666 (Tex. 1983).

Texas courts have long recognized that victims of medical negligence have a well-defined common law cause of action to sue for injuries negligently inflicted upon them. This much is undisputed. Under *Sax,* then, the remaining inquiry is whether the restriction on Lucas' right of recovery "is unreasonable *or* arbitrary when balanced against the purpose and basis of the statute" (emphasis added). We hold that the restriction is unreasonable *and* arbitrary and that article 4590i, sections 11.02 and 11.03, unconstitutionally limit Lucas' right of access to the courts for a "remedy by due course of law." Tex. Const. art. I, § 13. We note that there is no provision in the federal constitution corresponding to our constitution's "open courts" guarantee. Indeed, that guarantee is embodied in Magna Carta and has been a part of our constitutional law since our republic.

Our first concern with the statute is that the legislature has failed to provide Lucas any adequate substitute to obtain redress for his injuries. *See Sax,* 648 S.W.2d at 667, citing *Middleton v. Texas Power & Light Co.,* 108 Tex. 96, 185 S.W. 556 (1915). As did the Supreme Court of Illinois, we reject any argument that the statute may be supported by alleged benefits to society generally:

> Defendants argue that there is a societal *quid pro quo* in that loss of recovery potential to some malpractice victims is offset by "lower insurance premiums and lower medical care costs for all recipients of medical care." This *quid pro quo* does not extend to the seriously injured medical malpractice victim and does not serve to bring the limited recovery provision within the rationale of the cases upholding the constitutionality of the Workmen's Compensation Act.

*Wright,* 63 Ill.2d at 328, 347 N.E.2d at 742. Although *Wright* was not decided on "open

courts" grounds, the Illinois Supreme Court expressly held that limiting recovery only in malpractice actions was "arbitrary," which is at least part of our test under *Sax.*

It is significant to note that in two of the jurisdictions in which damages caps were upheld, the fact that alternative remedies were provided weighed heavily in the decisions. In *Johnson v. St. Vincent Hospital,* 404 N.E.2d at 601, the court stated "[t]he [Indiana] legislature responded by creating the patient compensation fund." Louisiana enacted a statute with a patient compensation fund identical to the Indiana statute. *Sibley v. Board of Sup'rs of Louisiana,* 462 So.2d at 156, *opinion modified,* 477 So.2d 1094 (La.1985).

It should be remembered that the Medical Liability Act of 1977 (now article 4590i) was based on recommendations of the Texas Medical Professional Liability Study Commission, sometimes referred to as the Keeton Report. Dean Keeton, in a separate statement, recommended a victim's compensation fund as a statutory substitute for limitations upon recovery. *See* Keeton Report at 51–52. The legislature chose not to follow this recommendation.

We also question whether the restrictions in sections 11.02 and 11.03 are reasonable when balanced against the purposes and bases of the statute.[2] The legislature, in enacting article 4590i, apparently did not intend to strike at frivolous malpractice suits for it found in section 1.02(a)(2) that "the filing of *legitimate* health care liability claims in Texas is a contributing factor affecting medical professional liability rates" (emphasis added). The legislature did find that a "medical malpractice insurance crisis" had been created and that "satisfactory insurance coverage ... [was] often not available at any price," but it then stated that "adoption of certain modifications in the medical, insurance, and legal systems ... *may or may not have an effect* on the rates charged by insurers for medical professional liability coverage."

Tex.Rev.Civ.Stat.Ann. art. 4590i, § 1.02(a)(5), (10), (12) (emphasis added).

In the context of persons catastrophically injured by medical negligence, we believe it is unreasonable *and* arbitrary to limit their recovery in a speculative experiment to determine whether liability insurance rates will decrease. Texas Constitution article I, section 13, guarantees meaningful access to the courts whether or not liability rates are high. As to the legislature's stated purpose to "assure that awards are rationally related to actual damages," section 1.02(b)(2), we simply note that this is a power properly attached to the judicial and not the legislative branch of government. Tex. Const. art. II, § 1. In any event, we hold it is unreasonable and arbitrary for the legislature to conclude that arbitrary damages caps, applicable to all claimants no matter how seriously injured, will help assure a rational relationship between actual damages and amounts awarded.

Even the Keeton Commission could not conclude there was any correlation between a damage cap and the stated legislative purpose of improved health care, stating that adequate data was lacking. Keeton Report at 7; *id.* at 38. One independent study has concluded that there is no relationship between a damage cap and increases in insurance rates [thereby reducing available · health care], given that less than .6% of all claims brought are for over $100,000. Sumner, *The Dollars and Sense of Hospital Malpractice Insurance,* 9 (Aft Books 1979).

We are supported in our decision to strike down the damages caps in article 4590i by the reasoning of the Florida Supreme Court invalidating that state's $450,-000 ceiling on noneconomic damages. *Smith v. Department of Insurance,* 507 So.2d 1080 (Fla.1987). Like the appellees in *Smith,* the medical defendant in our case argues that the legislature has not totally abolished a cause of action but merely placed a cap on damages that may be recovered and, therefore, has not denied the

---

**2.** In *Sax v. Votteler,* we said that the purpose and basis of a predecessor statute, Tex.Ins.Code Ann. art. 5.82, were legitimate. 648 S.W.2d at

667. However, that statute contained neither comparable legislative findings nor a limitation on damage recovery as in article 4590i.

right of access to the courts. The Supreme Court of Florida rejected these arguments. After first pointing out that the constitutional right of access to the courts must be read in conjunction with the right of trial by jury, the court stated:

> Access to the court is granted for the purpose of redressing injuries. A plaintiff who receives a jury verdict for, e.g., $1,000,000, has not received a constitutional redress of injuries if the legislature statutorily, and arbitrarily, caps the recovery. Nor, we add, because the jury verdict is being arbitrarily capped, is the plaintiff receiving the constitutional benefit of a jury trial as we have understood that right. Further, if the legislature may constitutionally cap recovery at $450,000, there is no discernible reason why it could not cap the recovery at some other figure, perhaps $50,000, or $1,000, or even $1.

*Smith*, 507 So.2d at 1088–89. *Compare Boyd v. Bulala*, 672 F.Supp. 915, 922 (W.D. Va.1987) ($1,000,000 damage cap violated right of jury trial under seventh amendment to the U.S. Constitution) (prior opinion in same case held that $750,000 cap violated right of jury trial under Virginia Constitution as well, 647 F.Supp. at 789).

The reasoning from the *Smith* opinion is entirely consistent with our "open courts" analysis in *LeCroy v. Hanlon*, 713 S.W.2d 335 (Tex.1986). *LeCroy* involved legislative interference with access to the courts by way of increased filing fees, much of which went to the state's general revenue fund. Clearly this was not a total abolition of the right of access. Nevertheless, the court held the fee increases invalid under Tex. Const. art. I, § 13. 713 S.W.2d at 338–42. Our opinion in *LeCroy* also concisely explained the importance and uniqueness of state constitutional rights:

> While state constitutions cannot subtract from rights guaranteed by the United States Constitution, state consti-

tutions can and often do provide additional rights for their citizens. The federal constitution sets the floor for individual rights; state constitutions establish the ceiling. Recently, state courts have not hesitated to look to their own constitutions to protect individual rights. This court has been in the mainstream of that movement.

> Like the citizens of other states, Texans have adopted state constitutions to restrict governmental power and guarantee individual rights. The powers restricted and the individual rights guaranteed in the present constitution reflect Texas' values, customs, and traditions. Our constitution has independent vitality, and this court has the power and duty to protect the additional state guaranteed rights of all Texans. By enforcing our constitution, we provide Texans with their full individual rights and strengthen federalism.

*LeCroy*, 713 S.W.2d at 338–39 (citations and footnote omitted).

We understand the legislature's concern in attempting to solve the health care problems it perceived during the middle of the 1970's. Nevertheless, we agree with the statement by the Supreme Court of New Hampshire: "It is simply unfair and unreasonable to impose the burden of supporting the medical care industry solely upon those persons who are most severely injured and therefore most in need of compensation." *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825, 837 (1980).[3]

For the reasons stated in this opinion, our answer to the certified question is that the limitation on medical malpractice damages in Tex.Rev.Civ.Stat.Ann. art. 4590i, §§ 11.02 and 11.03, is inconsistent with and violative of article I, section 13, of the Texas Constitution. The additional question certified to us is moot.

---

3. We note that in its efforts to protect health care providers from perceived harm, the legislature included other provisions in article 4590i that have failed to pass constitutional muster. *See Neagle v. Nelson*, 685 S.W.2d 11 (Tex.1985) (terminating a medical negligence cause of ac-

tion before it was possible to be discovered violated the open courts provision); *Sax v. Votteler*, 648 S.W.2d 661 (Tex.1983) (depriving a minor of a medical negligence cause of action violated the open courts provision).

GONZALEZ, J., files a dissenting opinion.

PHILLIPS, C.J., dissenting opinion to be filed.

GONZALEZ, Justice, dissenting.

I dissent. The issue is not the wisdom or fairness of the cap, but whether the cap bears a reasonable relation to a proper legislative purpose. I would hold that the limitation on recovery of nonmedical damages does not violate either the Equal Protection or the Due Process guarantees which are set forth in the Texas Constitution.

### History and Legislative Findings

In 1975, the Texas Legislature enacted legislation creating the Texas Medical Professional Liability Study Commission. The function of the Commission was to study the reasons why physicians, hospitals, and other health care providers were experiencing tremendous increases in malpractice insurance premiums. The Commission held hearings, gathered evidence and submitted recommendations to the legislature that reconvened in 1977. The legislature considered a majority and several minority reports before it enacted The Medical Liability and Insurance Improvement Act, found in TEX.REV.CIV.STAT.ANN. art. 4590i (Vernon Supp.1988). *See Keith, The Texas Medical Liability and Insurance Improvement Act—A Survey and Analysis of its History, Construction and Constitutionality,* 36 *Baylor L.Rev.* 265 (1984).

The Act provides: *The Legislature of the State of Texas finds* that:

(1) the number of health care liability claims (frequency) has increased since 1972 inordinately;

(2) the filing of legitimate health care liability claims in Texas is a contributing factor affecting medical professional liability rates;

(3) the amounts being paid out by insurers in judgments and settlements (severity) have likewise increased inordinately in the same short period of time;

(4) the effect of the above has caused a serious public problem in availability of and affordability of adequate medical professional liability insurance;

(5) the situation has created a medical malpractice insurance crisis in the State of Texas;

(6) this crisis has had a material adverse effect on the delivery of medical and health care in Texas, including significant reductions of availability of medical and health care services to the people of Texas and a likelihood of further reductions in the future;

(7) the crisis has had a substantial impact on the physicians and hospitals of Texas and the cost to physicians and hospitals for adequate medical malpractice insurance has dramatically risen in price, with cost impact on patients and the public;

(8) the direct cost of medical care to the patient and public of Texas has materially increased due to rising cost of malpractice insurance protection for physicians and hospitals in Texas;

(9) the crisis has increased the cost of medical care both directly through fees and indirectly through additional services provided for protection against future suits or claims; and defensive medicine has resulted in increasing cost to patients, private insurers, and the state and has contributed to the general inflation that has marked health care in recent years;

(10) satisfactory insurance coverage for adequate amounts of insurance in this area is often not available at any price;

(11) the combined effect of the defects in the medical, insurance, and legal systems has caused a serious public problem both with respect to the availability of coverage and to the high rates being charged by insurers for medical professional liability insurance to some physicians, health care providers, and hospitals;

(12) the adoption of certain modifications in the medical, insurance, and legal systems, the total effect of which is currently undetermined, may or may not have an effect on the rates charged by

insurers for medical professional liability insurance;

(13) *these facts have been verified by the Medical Professional Liability Study Commission,* which was created by the 64th Legislature. For further amplification of these facts *the legislature adopts the findings of the report of the commission.*

TEX.REV.CIV.STAT.ANN. art. 4590i, § 1.02(a) (Vernon Supp.1988) (emphasis added).

The stated purposes of the Act are to:

(1) reduce excessive frequency and severity of health care liability claims through reasonable improvements and modifications in the Texas insurance, tort, and medical practice systems;

(2) decrease the cost of those claims and assure that awards are rationally related to actual damages;

(3) do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis;

(4) make available to physicians, hospitals, and other health care providers protection against potential liability through the insurance mechanism at reasonably affordable rates;

(5) make affordable medical and health care more accessible and available to the citizens of Texas;

(6) make certain modifications in the medical, insurance, and legal systems in order to determine whether or not there will be an effect on rates charged by insurers for medical professional liability insurance; and

(7) make certain modifications to the liability laws as they relate to health care liability claims only and with an intention of the legislature to not extend or apply such modifications of liability laws to any other area of the Texas legal system or tort law.

TEX.REV.CIV.STAT.ANN. art. 4590i, § 1.02(b) (Vernon Supp.1988).[1]

As a starting point in our constitutional review of article 4590i, it cannot be overemphasized that:

[W]e begin with a presumption of validity. It is to be presumed that the Legislature has not acted unreasonably or arbitrarily; and a mere difference of opinion, where reasonable minds could differ, is not a sufficient basis for striking down legislation as arbitrary or unreasonable. The wisdom or expediency of the law is the Legislature's prerogative, not ours.... There is a strong presumption that a Legislature understands and correctly appreciates the needs of its own people, that its laws are directed to problems made manifest by experience, and that its discriminations are based upon adequate grounds.

*Smith v. Davis,* 426 S.W.2d 827, 831 (Tex. 1968); *see also Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex.1983). This presumption of constitutionality applies "whether the basis of constitutional attack is grounded in due process or equal protection." *Whitworth v. Bynum,* 699 S.W.2d 194, 197 (Tex.1985). The burden of demonstrating constitutional invalidity rests on the party assailing the statute. *Robinson v. Hill,* 507 S.W.2d 521, 524 (Tex.1974); *Smith v. Craddick,* 471 S.W.2d 375, 378 (Tex.1971).

### *Equal Rights*

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. Similarly, the Texas Constitution states that "[a]ll free men, when they form a social compact, have equal rights...." TEX. CONST. art. I, § 3.

Under traditional equal protection analysis, different levels of judicial scrutiny are applied depending upon the type of individual right which the State has chosen to affect through legislative classification. Under the equal protection clause of the

---

**1.** What *deference* or status should our court give these findings? Should we just ignore them as the majority has done?

Fourteenth Amendment, this Court has previously applied a two-tier analysis:

[T]he general rule is that when the classification created by the state regulatory scheme neither infringes fundamental rights or interests nor burdens an inherently suspect class, equal protection analysis requires that the classification be rationally related to a legitimate state interest.

*Sullivan v. University Interscholastic League*, 616 S.W.2d 170, 172 (Tex.1981). Thus, if the legislative classification does not affect a fundamental right or a suspect class, it need only be rationally related to a legitimate state interest in order to pass constitutional muster. *See Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 942–43, 59 L.Ed.2d 171 (1979). We apply this same two-prong analysis to the equal protection clause contained in Article I, Section 3 of the Texas Constitution. *Spring Branch I.S.D. v. Stamos*, 695 S.W.2d 556, 559–60 (Tex.1985).

The right accorded to a plaintiff to sue in tort for an injury is not a fundamental right. *See Sibley v. Board of Sup'rs of Louisiana*, 462 So.2d 149, 155, *opinion modified*, 477 So.2d 1094 (La.1985). Accordingly, the appropriate level of scrutiny to be applied in this case is whether the classifications drawn by article 4590i are rationally related to a legitimate state interest. *See Whitworth*, 699 S.W.2d at 197; *Spring Branch*, 695 S.W.2d at 559.

Article 4590i creates two classifications. First, section 11.02 draws a distinction between medical malpractice claimants and other tort claimants. Second, within the class of medical malpractice claimants, there is a distinction drawn based upon whether damages exceed $500,000. Under the rational basis test, I cannot say that this statute is not rationally related to the stated purposes of section 1.02(b). "Whether *in fact* the Act will [achieve its stated goals] is not the question: the Equal Protection Clause is satisfied ... if the Legislature *could rationally have decided*" that a cap of nonmedical damages would effectuate those goals. *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1980) (emphasis in original).

Where a local economic regulation is challenged on equal protection grounds, we must defer "to legislative determinations as to the desirability of particular statutory discrimination." *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1975).

In short, the judiciary may not sit as a super-legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines ..., in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment.

*Id.* at 303–04, 96 S.Ct. at 2517 (citations omitted). This reasoning applies with equal force to the equal rights provision of Article I, Section 3 of the Texas Constitution.

### Due Course

Article I, Section 19 of the Texas Constitution provides:

No citizen of this state shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

TEX. CONST. art. I, § 19.

Article I, Section 19 and the Fourteenth Amendment to the United States Constitution impose similar restrictions on the legislature. TEX. CONST. art. I, § 19; *Lively v. Missouri K. & T. Ry. Co. of Texas*, 102 Tex. 545, 120 S.W. 852 (1909); *Mellinger v. City of Houston*, 3 S.W. 249 (Tex.1887); *Massachusetts Indem. & Life v. Tex. State Bd. of Ins.*, 685 S.W.2d 104 (Tex.App.—Austin 1985, no writ). The standard of review for constitutional challenges on substantive due process grounds for both the state and federal due process clauses is as follows:

If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor

discriminatory, the requirements of due process are satisfied. . . .

*Nebbia v. New York,* 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1933).

Accordingly, I would apply the following standard of review under Article I, Section 19 of the Texas Constitution: whether the medical caps in article 4590i bear a reasonable relation to a proper legislative purpose. Under this standard, I cannot say that the limitation of damages provisions violate Article I, Section 19 of our state constitution.

### Open Courts

The other due process guarantee in the Texas Constitution is the open courts provision, which provides as follows:

> All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

TEX. CONST., art. I, § 13. Similar guarantees are found in the constitutions of thirty-seven other states. 1 G. Braden, *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 51 (1977).

Article I, Section 13 provides two separate and distinct guarantees: (1) all courts shall be open, and (2) every person shall have remedy for injury by due course of law. The former category guarantees a right of "access," while the latter category guarantees a right of "redress." No opinion of this court has discussed the independent guarantee of redress; rather, the focus of our analysis has been upon those legislative enactments which impose impossible or unreasonable conditions on a litigant's right of access to the courts. It is of course obvious that an entire abrogation of access results in an entire denial of redress. Thus, to that extent, the right of access and redress are inextricably inter-twined. However, this case presents a slightly different question because section 11.02 of Article 4590i leaves the right of access wholly intact; only the right of redress is partially restricted.

Thus, this case presents two important questions of first impression. Does a legislative enactment which partially restricts the right of redress trigger the protections of Article I, Section 13? If so, what is the appropriate standard of review to be applied?

I have found no case which interprets the open courts provision as independently protecting a litigant's right of redress. I am mindful, however, of the text of our Constitutional provision: "every person ... shall have remedy by due course of law." TEX. CONST. art. 1, § 13. I agree with the majority that the protections of Article I, Section 13 do extend to legislative enactments which allow free access but restrict redress. I further agree that the appropriate standard of review is whether the legislative purpose for the statute outweighs the partial diminution of a litigant's constitutionally-guaranteed right of redress. I vigorously disagree, however, with the majority's implication that the appropriate standard of review includes the existence of a reasonable substitute (individual quid pro quo) as a *constitutional* prerequisite to statutory validity.

### Standard of Review

It is at this juncture that I depart from the majority opinion, and register my dissent. The challenged statute here restricts but does not totally abrogate recovery.[2] I would hold that section 11.02 of article 4590i is constitutional under Article I, Section 13.

This court recently articulated the standard for reviewing the constitutionality of a statute which abrogates the individual's

---

2. As will be discussed, neither *Middleton, Lebohm, Sax,* nor this case requires an individual quid pro quo. However, even if a cogent argument can be made that these authorities do in fact require an individual substitute, none of these cases deal with legislation which partially restrict redress. To the contrary, these decisions construe enactments which totally abrogate a well-defined common law cause of action. Because this case presents a much less intrusive level of interference, I submit that the corresponding standard of review does not require the existence of an individual quid pro quo; a *societal* quid pro quo is sufficient. *Lebohm,* 275 S.W.2d at 955.

right of access. In *Sax v. Votteler*, 648 S.W.2d 661 (Tex.1983) we noted:

> [T]he right to bring a well established common law cause of action cannot be effectively abrogated by the legislature absent a showing that the legislative basis for the statute outweighs the denial of the constitutionally-guaranteed right of redress. In applying this test, we consider both the general purpose of the statute and the extent to which the litigant's right of redress is affected....
>
> In analyzing the litigant's right to redress, we first note that the litigant has two criteria to satisfy. First, it must be shown that the litigant has a cognizable common law cause of action that is being restricted. Second, the litigant must show that the restriction is unreasonable or arbitrary when balanced against the purpose and basis of the statute.

*Id.* at 666.[3]

While we have referred to the nonexistence of a reasonable substitute in cases holding certain legislative enactments unconstitutional, this court has fallen short of requiring the existence of an individual quid pro quo in order to survive constitutional attack. *Id.* at 667 (*citing Middleton v. Texas Power & Light Co.*, 185 S.W. 556 (1916), *aff'd* 249 U.S. 152, 39 S.Ct. 227, 63 L.Ed. 527 (1919)). It must be noted that the court in *Middleton* viewed the open courts provision as merely proscribing legislative abolition of intentional wrongs. *Middleton*, 185 S.W. at 560; *Reed Tool Co. v. Copelin*, 610 S.W.2d 736, 739 (Tex.1980). Not only could the legislature modify or abolish the common law rule of contributory negligence, it could entirely abolish negligence altogether:

> If, in a word, [the Legislature] may declare that contributory negligence shall no longer be a defense, may it not also declare, as to purely accidental injuries, that negligence shall no longer be actionable? If is may also change defensive common law rules, may it not also change a common law rule of liability? The power of the Legislature cannot ex-

ist in the one instance and not in the other.

*Id.* at 561. How then could *Middleton* be authority that a reasonable substitute remedy is *constitutionally* required when that decision did not even interpret legislative modifications of non-intentional acts as triggering the protections of Article I, Section 13? It simply cannot.

While the majority is guarded in its language, the implied basis in today's opinion for striking down the damages limitations is a perceived lack of a reasonable substitute for the impairment of the litigant's right of redress. I believe that this requirement can be harmonized with our test set out in *Sax* by making the existence of an individual quid pro quo a *factor* in determining whether the statutory scheme denying the constitutionally-guaranteed right of redress is reasonable.

It must be emphasized that the language in *Sax*, which refers to the substitution of other remedies, is borrowed from *Lebohm v. City of Galveston*, 275 S.W.2d 951, 954 (1955). Yet *Lebohm* did not limit its holding to the substitution of an *individual* remedy. Rather, the court expressly recognized that an individual quid pro quo is unnecessary if a *societal* quid pro quo exists:

> Thus it may be seen that legislative action withdrawing common-law remedies for well-established common-law causes of action for injuries to one's "lands, goods, person or reputation" is sustained only when it is reasonable in substituting other remedies, *or when it is a reasonable exercise of the police power in the interest of the general welfare.*

*Id.* at 955 (emphasis added).

This court has never expressly required an individual quid pro quo in the past; to do so now would unquestionably restrain the legislature's ability and duty to effect social change through legislative enactment. Article I, Section 13 does not guarantee the continued existence of a common

---

**3.** Although *Sax* refers to the right of redress, it is undisputed that the child's right to bring a well established common law cause of action was completely abrogated. *Id.* at 667. Thus, *Sax* is an "access" case rather than a "redress" case.

law cause of action, but only proscribes the creation of an impossible or unreasonable impediment to access or redress to vindicate a recognized and justiciable substantive right. The open courts provision was never intended to create any new rights, nor was it intended to elevate the common law to constitutional stature.

### Sax and Article 4590i, Section 11.02

Under *Sax*, the test for determining the constitutionality of a restriction of an individual's right to redress is whether the legislative basis for the statute outweighs the denial of the constitutionally-guaranteed right of redress. *Sax*, 648 S.W.2d at 665. *See also Nelson v. Krusen,* 678 S.W. 2d at 922 (citing *Hanks v. City of Port Arthur,* 121 Tex. 202, 48 S.W.2d 944 (1932) and *McCrary v. City of Odessa,* 482 S.W. 2d 151 (Tex.1972)). "In applying this test, we consider both the general purpose of the statute and the extent to which the litigant's right to redress is affected." *Sax* at 666. Legislative action withdrawing or restricting a common law remedy will be sustained if it is reasonable in substituting other remedies. *Sax* at 665 (citing *Lebohm*). I believe the stated purposes for enacting the Medical Liability and Insurance Improvement Act demonstrates that the legislature acted reasonably under this standard.

Two of the stated purposes of article 4590i are to:

(4) make available to physicians, hospitals, and other health care providers protection against potential liability through the insurance mechanism at reasonable affordable rates;

(5) make affordable medical and health care more accessible and available to the citizens of Texas;

. . . .

TEX.REV.CIV.STAT.ANN. art. 4590i, § 1.02(b) (Vernon Supp.1988). Although an individual quid pro quo is not constitutionally required, I nonetheless submit these two purposes reveal that the medical cap in section 11.02 of article 4590i provides both a societal and individual quid pro quo. The benefit to society is that by reducing the awards given to those injured in excess of the caps, insurance payouts are more readily calculable. This in turn allows a predictable rate structure to be erected, thus allowing policies to be written on health care providers who otherwise could not afford the exorbitant rates associated with policies of undeterminable risk. The resultant societal quid pro quo is the decrease in cost of medical malpractice insurance in the state of Texas and the increased availability of health care. I further suggest there is an individual quid pro quo because the caps enable health care providers to procure insurance in the first place. Without adequate coverage, it was reasonable for the Legislature to conclude that the plaintiff in a medical malpractice case would suffer damages with no recovery at all against an insolvent, judgment-proof defendant. I submit that a recovery of all medical costs and expenses, with a cap on $500,000 plus a Consumer Price Index adjustment on other damages, is better than a potential recovery of zero. Thus, while a reasonable substitute should not be required for legislative *modifications* of causes of action, I suggest there is in fact a sufficient quid pro quo in this case. I agree with the position taken by the California Supreme Court:

> [E]ven if due process principles required some "quid pro quo" to support the statute, it would be difficult to say that the preservation of a viable medical malpractice insurance industry in this state was not an adequate benefit for the detriment the legislation imposes on malpractice plaintiffs.

*Fein v. Permanente Medical Group,* 38 Cal.3d 137, 160, n. 18, 211 Cal.Rptr. 368, 385, n. 18, 695 P.2d 665, 681–82 n. 18 (1985).

In determining whether a litigant's right of redress is unreasonably or arbitrarily restricted, four distinct characteristics of article 4590i must be emphasized. First, the medical malpractice claimant is allowed to recover all past and future medical expenses without limitation. Secondly, the plaintiff may recover up to $500,000 of nonmedical damages. Thirdly, the legislature provided for an upward adjustment of the damages limit based upon the Consum-

er Price Index. And fourth, the statute imposes a limitation on the liability of health care providers rather than an absolute ceiling on the amount a plaintiff can recover. Thus, where multiple defendants are involved, the medical malpractice plaintiff can recover against each. The statutory limits are applied on a per defendant basis rather than on a per occurrence basis. It is clear, therefore, that the Legislature was concerned with limiting the liability of each defendant, not with unreasonably and arbitrarily limiting the amount a plaintiff can recover. These aspects of the statute serve to distinguish it from all other state versions which have undergone constitutional attack.

### Out of State Authorities

The majority concludes that a $500,000 cap on nonmedical damages is arbitrary, and cites with approval *Wright v. Central Du Page Hospital Ass'n*, 63 Ill.2d 313, 347 N.E.2d 736, 742 (1976). Reliance on *Wright* is inappropriate and misplaced. In *Wright*, the defendant, relying upon case law upholding constitutional challenges to the Illinois Workman's Compensation Act, maintained there existed under that state's damages cap a societal quid pro quo: the loss of recovery potential to some plaintiffs was offset by the lower medical care and insurance costs to society in general. The Illinois Supreme Court rejected this argument because any quid pro quo that existed was insufficient to save the challenged statutory provision. *Id.*, 347 N.E.2d at 742. The crucial distinction in *Wright*, however, was the court's concern that under the Illinois statute, *medical expenses were capped.* Unlike the Workman's Compensation Act, which allowed all "medical expenses and payment of compensation for the duration of . . . incapacity," the medical malpractice plaintiff may "be unable to recover even all the medical expenses he might incur." *Id. Such is not the case in Texas. Article 4590i allows full and complete recovery of all medical expenses; only nonmedical damages are capped.* TEX.REV.CIV.STAT.ANN. art. 4590i, § 11.02 (Vernon Supp.1988).

The majority places great emphasis on the fact that in some of the jurisdictions which upheld statutes imposing damages caps, alternative remedies were provided. *See* 757 S.W.2d 689 (*citing Johnson v. St. Vincent Hospital*, 273 Ind. 374, 404 N.E.2d 585, 601 (1980); *Sibley v. Board of Sup'rs of Louisiana*, 462 So.2d 149, 156, *opinion modified*, 477 So.2d 1094 (La.1985)). It should be noted, however, that both Indiana and Louisiana have medical caps of $500,000 as an *absolute ceiling* on *all damages*, thus necessitating in my view a higher level of constitutional justification. *See generally, Johnson*, 404 N.E.2d at 601 (existence of patient compensation fund to increase availability of medical insurance); *see also Sibley*, 462 So.2d at 156 (Louisiana's Act modeled on Indiana's Act). Neither court required the existence of a quid pro quo as a constitutional prerequisite.

The majority's reliance on *Smith v. Department of Insurance*, 507 So.2d 1080 (Fla.1987), is equally unconvincing. Although *Smith* held that a $450,000 cap on noneconomic damages violated Florida's open courts provision, it did so because no "legislative showing of an overpowering public necessity for the abolishment of such right, and no alternative method of meeting such public necessity can be shown." *Id.* at 1089. Such a heightened standard is not followed in Texas. As stated previously, the test to be applied in the context of a constitutional challenge under Texas' open courts provision is whether the diminution of redress is "unreasonable or arbitrary when balanced against the purpose and basis of the statute." *Sax*, 648 S.W.2d at 666. I cannot conclude that section 11.02 is constitutionally infirm under the standard enunciated in *Sax*.

Reliance on *Arneson v. Olson*, 270 N.W.2d 125 (N.D.1978) is also misplaced. North Dakota's damages cap was a *total cap* of $300,000 which might prevent seriously injured victims from recovering all of their medical expenses. As previously noted, such is not the case in Texas.

It is true that several states have invalidated statutory provisions limiting damages in medical malpractice actions on a

variety of theories. With only two exceptions, however, these invalidated statutes contained absolute ceilings on both pecuniary and nonpecuniary damages.[4] What distinguishes article 4590i from other statutory schemes is its full allowance of all medical costs and expenses; only nonmedical injuries are limited.

The majority cites with approval the language used by the Supreme Court of Florida: "[I]f the legislature may constitutionally cap recovery at $450,000 there is no discernable reason why they could not cap the recovery at some other figure, perhaps $50,000 or $1,000 or $1." At 692. This argument ignores the fact that any modification the legislature makes is subject to being stricken as unconstitutional. A reduction of nonmedical damages to a lesser cap at some point would be manifestly so insufficient as to become a denial of justice.

Plaintiffs have no vested property rights in a particular measure of damages. This is without doubt since a "vested right" must be something more than a mere expectation based on anticipated continuance of existing law. It must become a title, legal or equitable, to present or future enjoyment of property. *National Carloading Corp. v. Phoenix–El Paso Express,* 142 Tex. 141, 176 S.W.2d 564 (1944), *cert. denied,* 322 U.S. 747, 64 S.Ct. 1156, 88 L.Ed. 1578 (1944). The legislature has broad powers to modify the scope and nature of such damages. *See American Bank & Trust Co. v. Community Hospital,* 36 Cal.3d 359, 204 Cal.Rptr. 671, 683 P.2d 670 (1984). I am not prepared to hold that an award of close to $1 million ($500,-000 plus consumer index adjustment provided for in § 11.04 of the Act) for nonmedical damages coupled with no limitation on past and future medical expenses is so arbitrary and unreasonable that it does not pass constitutional muster. Therefore, this cap is no more a violation of the open courts provision of the Texas Constitution than the fee increase was in *LeCroy,* 713

S.W.2d at 343 (Gonzalez, J., dissenting).

### Special Legislation

The majority intimates that the damages caps of article 4590i constitute a special law in violation of Article III, section 56 of the Texas Constitution. That section prohibits the Legislature from passing local or special laws, except as otherwise provided by the Texas Constitution. TEX. CONST. art. III, § 56. In *Clark v. Finley,* 93 Tex. 171, 54 S.W. 343 (1899), the court defined a "local" law as one which confines its operation to a fixed part of the territory of the state. *Id.* at 346. A "special law" was defined as a statute which relates to particular persons or things of a class. *Id.* at 345.

The damages caps cannot be classified as a local law because these statutes apply equally to all citizens throughout the State of Texas. *Wood v. Wood,* 159 Tex. 350, 320 S.W.2d 807, 809 (1959); *County of Cameron v. Wilson,* 160 Tex. 25, 326 S.W.2d 162, 165 (1959); *Clark v. Finley,* 54 S.W. 343, 346. Nor can it be said that section 11.02 of article 4590i constitutes a special law in favor of a certain class of litigants. As we said in *Miller v. El Paso County,* 136 Tex. 370, 150 S.W.2d 1000, 1001–1002 (1941):

> [T]he courts recognize in the Legislature a rather broad power to make classifications for legislative purposes and to enact laws for the regulation thereof, even though such legislation may be applicable only to a particular class....; such legislation must be intended to apply uniformly to all who may come within the classification designated in the Act, and the classification must be broad enough to include a substantial class and must be based on characteristics legitimately distinguishing such class from others with respect to the public purpose sought to be accomplished....

Thus, the Legislature is unquestionably empowered to create classifications of per-

---

**4.** The two exceptions are New Hampshire and Florida. *See Carson v. Maurer,* 424 A.2d 825, 836 (1980); *Smith v. Department of Insurance,* 507 So.2d 1080, 1088–89 (Fla.1987). Both courts struck down the medical caps according to a heightened "intermediate scrutiny" standard of review. Texas does not apply such a standard.

sons and things, so long as the classifications are not arbitrary. Where a reasonable relationship exists between the classification and the objectives sought to be accomplished by the statute, Article III, Section 56 is not violated. *Id. See also Smith v. Davis,* 426 S.W.2d 827, 830 (Tex. 1968).

It is evident that the class affected by the medical damages caps are health care providers. Distinguishing that class of tortfeasors from others is reasonable in light of the legislative findings that a medical malpractice insurance crisis exists in Texas, and the legislative objectives of increasing the availability and affordability of health insurance in this state. The primary and ultimate test for determining whether the caps pass constitutional scrutiny under Article III, Section 56 has been met: there is a reasonable basis for the classification it makes, and the law operates equally on all within the class. *Robinson v. Hill,* 507 S.W.2d 521, 525 (Tex.1974).

### Conclusion

At the time 4590i was enacted, Texas was faced with a crisis in the affordability and availability of medical malpractice insurance. As a result of the crisis, many physicians and health care providers had ceased or reduced the scope of their practice. We must measure whether the legislature's action was arbitrary in light of these circumstances. Even though many of the findings made by the legislature were not based upon Texas' experience, the legislature could have reasonably believed that without some measure of cost reduction, future medical malpractice claimants would experience difficulty in obtaining collectible judgments for any of their damages. Thus, the legislature could have reasonably and rationally concluded that capping the amount of nonmedical damages in a medical malpractice action would improve the availability and cost of malpractice insurance in the State of Texas.

I acknowledge that there are serious questions surrounding the causes of the medical malpractice insurance crisis. I also acknowledge that the validity of some of the findings made by the Study Commission and adopted by the legislature are questionable. However, the findings are "legislative facts" which should be accorded great deference by this court, particularly because reasonable minds can differ as to the causes of the crisis. For us to "unfind" that there is a crisis on the state of this record is to act like a "super legislature" in violation of the separation of powers doctrine. We must respect the process. Whatever flaws exist in the legislative findings, the proper forum to correct them is the Texas Legislature and not this court. For the above reasons, I dissent.

MAY 25, 1988

CULVER, Justice, concurring.

I agree with the result reached by the majority. However, I do so with caution because I believe that legislative caps on medical malpractice awards could be consistent with the Texas Constitution under certain circumstances.

The damages limitations contained in Tex.Rev.Civ.Stat.Ann. art. 4590i, §§ 11.02 and 11.03 would not unconstitutionally limit Lucas' right of access to the courts for a "remedy by due course of law" if the legislature had seen fit to provide Lucas and those similarly situated with an alternative remedy. The majority notes that "in two of the jurisdictions in which damages caps were upheld, the fact that alternative remedies were provided weighed heavily in the decisions," citing *Johnson v. St. Vincent Hospital,* 273 Ind. 374, 404 N.E.2d 585, 601 (1980) and *Sibley v. Board of Supervisors,* 462 So.2d 149, 156 (La.1985), *modified on reh'g,* 477 So.2d 1094, 1109–10 (La.1985) (latter opinion ordering conditional remand on state equal protection challenge). The majority observes that the state legislatures of Indiana and Louisiana had established "patient compensation funds." The majority further observes that Dean Keeton urged that a victim's compensation fund be established as a substitute for the damages caps in question here. I share the concern expressed by the majority that lack of alternative remedies renders these caps unreasonable and arbitrary when bal-

anced against the purpose and basis of the statute.

I have chosen to express my views separately because I do not wish to be understood as saying that all damages caps are fundamentally unconstitutional. I do not interpret the majority opinion to stand for such a proposition, but to the extent the majority may be interpreted to so hold, I would disagree. In my view, damages caps could survive constitutional scrutiny if the statutory scheme provided an adequate alternative remedy, such as a patient compensation fund, for victims of catastrophic injuries.

SEPTEMBER 21, 1988

PHILLIPS, Chief Justice, dissenting.

I respectfully dissent. I would hold that the $500,000 cap on non-medical damages, TEX.REV.CIV.STAT. art. 4590i, § 11.02, does not violate any provision of the Texas Constitution. I would further hold that the cap operates to limit the liability of each defendant rather than the recovery of each plaintiff.

## I. CONSTITUTIONALITY

This case comes to us upon certification of questions of law by the United States Court of Appeals for the Fifth Circuit. TEX.CONST. art. V, § 3–c. The parties to the federal court case have filed briefs and presented oral argument before this court. The parties have joined issue on the constitutionality of both section 11.02 and the alternative cap, TEX.REV.CIV.STAT. art. 4590i, § 11.03, under the equal protection clause and the open courts provision of the Texas Constitution. Various amici curiae have also appeared, additionally raising whether the caps violate the due course of law and right to trial by jury provisions of

the Texas Constitution. Finally, the court itself alludes to the possibility that the provisions may violate the prohibition against special laws in the Texas Constitution. Because of the importance and difficulty of the issues in this case, I will review each of these five possible grounds of constitutional attack.[1] Having found section 11.02 to be constitutional, I need not make a separate determination as to the constitutionality of the alternative $150,000 cap on non-economic damages. I note my belief, though, that the court further erred by also holding the alternative cap unconstitutional.

*Equal Protection*

The Lucases and all aligned amici curiae allege that both damages limitations violate the equal protection clause of the Texas Constitution. That clause provides as follows:

> All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services.

TEX.CONST. art. I, § 3.

Equal protection is violated when a statute makes invidious or unreasonable classifications. The limitation on medical malpractice awards clearly treats different classes of people in different ways. First, it differentiates between those persons who sue and are awarded a particular amount of damages in a medical malpractice case from those who sue and are not. Second, it differentiates between those persons who sue for medical malpractice and are awarded a particular amount of damages from those who sue for other torts and are awarded a similar amount. These differ-

---

**1.** In an ordinary appeal, this court would be limited in its review to those constitutional attacks properly preserved and presented to this court by the party attacking the validity of the statute. *See Texas Pub. Bldg. Auth. v. Mattox,* 686 S.W.2d 924, 927 (Tex.1985). Because this matter comes to us through certification, however, our jurisdiction is not so constrained. Although Tex.R.App.P. 114(e) provides for briefing under the usual rules "so far as reasonably applicable," the procedure here is fundamentally different from an appeal. In what is essentially the first advisory opinion ever constitutionally rendered by this court, we should review and resolve all issues necessary to answer fully the questions presented to us. *See generally* Brown, *Certification of State Law Questions,* 48 Tex.B.J. 300 (1985); Brown, *Certification—Federalism in Action,* 7 Cum.L.Rev. 455 (1977).

ences must be analyzed to determine whether they are objectionable under our Constitution.

When an equal protection challenge is made to a law, the reviewing court must initially determine the appropriate standard of review. *Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 906 at n. 6, 106 S.Ct. 2317, 2323 at n. 6, 90 L.Ed.2d 899, 907–08 at n. 6 (1986) (plurality opinion). Simply put, the court must decide how strictly to examine the classifications made by the particular statute.

The United States and its aligned amici contend that Texas interprets its equal protection clause in the same manner as the United States Supreme Court interprets the corresponding provision of the United States Constitution. Plaintiffs and their aligned amici curiae, on the other hand, insist that the Texas Constitution requires a more intense scrutiny of legislative distinctions than does the equal protection clause of the Fourteenth Amendment.

From a review of our opinions, I believe that Texas courts have traditionally adopted the federal equal protection analysis in interpreting our own equal protection provision. Of course, our courts are free to give independent meaning to similar or even identical state constitutional language from that given by the federal courts to the United States Constitution. Just as clearly, however, we may defer to federal interpretations of similar provisions in giving meaning to our own Constitution. *See, e.g., Brown v. State*, 657 S.W.2d 797 (Tex. Crim.App.1983); *Developments in the Law —The Interpretation of State Constitutional Rights*, 95 Harv.L.Rev. 1324 (1982).

While the wording of our equal protection clause seems broader than the corresponding provision of the United States Constitution, no decision of a Texas court has ever actually held that this textual distinction makes a difference. On the contrary, both courts and commentators have concluded that the protections are identical. *See Lively v. Missouri K. & T. Ry. Co.*, 102 Tex. 545, 558–59, 120 S.W. 852, 856 (1909); *Texas Optometry Bd. v. Lee Vision Center, Inc.*, 515 S.W.2d 380, 386 (Tex.Civ.App. —Eastland 1974, writ ref'd n.r.e.); Williams, *Equality Guarantees in State Constitutional Law*, 63 Texas L.Rev. 1195, 1219 n. 160 (1985). Even when our courts have not expressly held that the scope of the clauses are the same, the assumption of identicality is inherent in most of our decisions. Thus many opinions have relied primarily on federal authority in interpreting the Texas equal protection clause. *See, e.g., State v. Project Principle, Inc.*, 724 S.W.2d 387, 391 (Tex.1987); *Spring Branch I.S.D. v. Stamos*, 695 S.W.2d 556, 559–60 (Tex.1985); *King v. Board of Trustees*, 555 S.W.2d 925, 928–29 (Tex.Civ.App.— El Paso 1977, writ ref'd n.r.e.). Most courts have drawn no distinction between state and federal equal protection clauses when both have been invoked. *See, e.g., San Antonio Retail Grocers v. Lafferty*, 156 Tex. 574, 297 S.W.2d 813 (1957); *Gerard v. Smith*, 52 S.W.2d 347, 351 (Tex.Civ. App.—El Paso 1932, writ ref'd); *Stout v. Grand Prairie I.S.D.*, 733 S.W.2d 290, 295 (Tex.App.—Dallas 1987, writ ref'd, n.r.e.); *Smith v. Smith*, 720 S.W.2d 586, 598 (Tex. App.—Houston [1st Dist.] 1986, no writ). From many of this court's opinions, in fact, it is even impossible to ascertain whether federal or state equal protection claims, or both, were being asserted by the litigants. *See, e.g., City of Brookside Village v. Comeau*, 633 S.W.2d 790, 795–96 (Tex.1982); *Texas Woman's Univ. v. Chayklintaste*, 530 S.W.2d 927, 928–29 (Tex.1975); *Texas Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 650–51 (Tex.1971); *State v. Spartan's Indus., Inc.*, 447 S.W.2d 407, 412–13 (Tex.1969). Texas courts obviously look to federal equal protection analysis in interpreting our own provision.

In applying the equal protection clause of the Fourteenth Amendment, the United States Supreme Court has articulated three levels of scrutiny. The choice of the applicable tier is determined by examining both the classes and the rights affected by the distinctions made in the challenged statute.

Strict scrutiny, the most rigorous level of review, is applied to a law that burdens an inherently suspect class or affects a fundamental liberty right. The burden to justify

such a distinction rests on the party defending it, and such a law cannot be upheld unless it serves a compelling state interest and is "closely tailored to effectuate only those interests." *Zablocki v. Redhail*, 434 U.S. 374, 388, 98 S.Ct. 673, 682, 54 L.Ed.2d 618, 631 (1978). Intermediate, middle-tier, or means scrutiny is applied when a statute burdens a sensitive, but not a suspect, class, or impinges on an important, but not a fundamental, right. *See* L. Tribe, *American Constitutional Law* 1610–18 (2nd ed. 1988). Laws subjected to this scrutiny "must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 458, 50 L.Ed.2d 397, 407 (1976). All remaining legislation is subject only to minimal scrutiny, and will be upheld so long as the classifications made are "rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985) (plurality opinion). Under this standard, a statutory discrimination will be upheld "if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, 399 (1961). Almost all legislative distinctions will withstand this level of scrutiny.

The federal courts have applied strict scrutiny very sparingly. Only race, and perhaps national origin, have consistently been regarded as suspect, *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), although alienage has at times been accorded this status. *Compare Graham v. Richardson*, 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534, 541–42 (1971), *with Foley v. Connelie*, 435 U.S. 291, 297, 98 S.Ct. 1067, 1071, 55 L.Ed.2d 287, 293 (1978). Similarly, only those fundamental liberty rights "explicitly or implicitly guaranteed by the Constitution," *San Antonio I.S.D. v. Rodriquez*, 411 U.S. 1, 33–34, 93 S.Ct. 1278, 1296–97, 36 L.Ed.2d 16, 43–44 (1973), are so important that classifications affecting them are usually strictly scrutinized. Such rights include those fundamental guarantees of the Bill of Rights applied to the State by incorporation into the due process clause of the Fourteenth Amendment, as well as the right of free association, *NAACP v. Alabama ex. rel. Patterson*, 357 U.S. 449, 460–61, 78 S.Ct. 1163, 1170–71, 2 L.Ed.2d 1488, 1498–99 (1958), the right of access to the political process, *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 666, 86 S.Ct. 1079, 1087, 16 L.Ed.2d 169, 172 (1966), the right of travel between States, *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600, 615 (1969), the right to privacy in certain personal decisions, *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010, 1018 (1967), and perhaps others. *See* 2. R. Rotunda, et al., *Treatise on Constitutional Law*, 79–86 (1986).

Intermediate scrutiny has also been applied rather sparingly by the federal courts. It has been employed almost exclusively where distinctions have been made regarding gender, *Craig v. Boren, supra*, illegitimacy, *Matthews v. Lucas*, 427 U.S. 495, 505, 96 S.Ct. 2755, 2762, 49 L.Ed.2d 651, 660–61 (1976), and perhaps alienage, *see Plyler v. Doe*, 457 U.S. 202, 223–24, 102 S.Ct. 2382, 2398, 72 L.Ed.2d 786, 803 (1982), although other classes have occasionally been accorded slightly heightened scrutiny. *See, e.g., City of Cleburne v. Cleburne Living Center, supra* (mental retardation).

Because no independent equal protection analysis has been developed under the Texas Constitution, our courts apply the same tiers of scrutiny with identical standards of review to classifications challenged under the Texas equal protection clause. *See, e.g., Spring Branch I.S.D. v. Stamos*, 695 S.W.2d 556, 559 (Tex.1985) (applying minimal scrutiny to classifications involving economic and social policy); *Houston Chronicle Publishing Co. v. City of Houston*, 620 S.W.2d 833, 838–39 (Tex.Civ.App.—Houston [14th Dist.] 1981, no writ) (applying strict scrutiny under both state and federal constitutions to First Amendment

fundamental rights);[2] *In Interest of B.M.N.,* 570 S.W.2d 493, 498–500 (Tex.Civ. App.—Texarkana 1978, no writ) (applying intermediate scrutiny under both state and federal constitutions to classification based on illegitimacy).

The rational basis test is the measure by which most laws are, and should be, judged. Making classifications is at the heart of the legislative function. If the courts were to strike down every statute which treated different people differently, there could be no efficient system of laws. Even if the courts were only to strike down those classifications which a majority of judges felt unwise or unsound, the constitutionally mandated division of powers between such branches of our government would be substantially altered. *See generally* TEX. CONST. art. II, § 1. The least democratic branch of government would become the most powerful, with a resulting diminution in the people's right of self-government. *See generally* R. Berger, *Government by Judiciary* (1977).

The Lucases and associated amici curiae assert, however, that Texas has entirely abandoned the federal rational basis test. This contention is based primarily on language from one opinion of the United States Supreme Court and two opinions of this court. In my opinion, none of these decisions support the proposition that Texas has developed an independent equal protection standard.

In *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 102 S.Ct. 1070, 71 L.Ed. 2d 152 (1982), the Supreme Court declined to rule on the constitutionality of a Texas municipal ordinance because the Fifth Circuit Court of Appeals might have reached its judgment on independent grounds under the Texas Constitution. After taking note of the "arguably significantly broader" language of the Texas equal protection clause, *id.* at 293, 102 S.Ct. at 1077, 71 L.Ed.2d at 162, the Court observed that the Fifth Circuit had intermingled its discussion of the equal protection guarantees under the Texas and federal constitutions, and in so doing had stated inconsistent formulations of the rational basis test. The Court said:

> [T]he [Fifth Circuit] court stated that "[t]he test requires that legislative action be rationally related to the accomplishment of a legitimate state purpose," and cited both federal and state decisions in support of that formulation. In the second paragraph, the court stated that "[t]he test requires that legislation constitute a means that is 'reasonable, not arbitrary and rests upon some ground of difference having a fair and substantial relation to the object of the legislation....,'" quoting from a decision of the Texas Supreme Court, Texas *Woman's University v Chayklintaste,* 530 SW2d 927, 928 (1975), which in turn quoted from *Reed v Reed,* 404 US 71, 76, 30 L Ed 2d 225, 92 S Ct 251. A number of this Court's decisions were cited as in accord with this formulation. Although we cannot be sure, we might reasonably infer that the second formulation of the test represents the Court of Appeals' interpretation of Texas law.

455 U.S. at 294 n. 17, 102 S.Ct. at 1077 n. 17, 71 L.Ed.2d at 162–63 n. 17. The Court went on to find the "second formulation" to be at variance with current federal analysis, saying:

> This formulation is derived from this Court's opinion in *F.S. Royster Guano Co. v. Virginia,* 253 US 412, 415, 64 L Ed 989, 40 S Ct 560. But it is unclear whether this Court would apply the Royster Guano standard to the present case. See *United States Railroad Retirement Bd. v. Fritz,* 449 US 166, 66 L Ed 2d 368, 101 S Ct 453; *Craig v Boren,* 429 US 190, 50 L Ed 2d 397, 97 S Ct 451. Therefore, it is surely not evident that the Texas standard and the federal standard are congruent.

---

**2.** Pursuant to the Equal Rights Amendment, strict scrutiny is also applied in Texas to all classifications involving the protected classes of sex, race, color, creed and national origin. TEX. CONST. art. I, § 3a. Classifications affecting these categories are not, however, also automatically subjected to heightened scrutiny under the equal protection clause of the Texas Constitution. *See In Interest of McLean,* 725 S.W.2d 696, 697–98 (Tex.1987); *Mercer v. Board of Trustees,* 538 S.W.2d 201 (Tex.Civ.App.— Houston [14th Dist.] 1976, writ ref'd n.r.e.).

455 U.S. at 294, 102 S.Ct. at 1077, 71 L.Ed. 2d at 162–63.

The Supreme Court's deference to the principles of federalism is commendable. There is, however, no different Texas equal protection standard.[3] This court's opinion in *Chayklintaste*, upon which the Supreme Court based its rationale, relied not only on *Reed*, but also on *McGinnis v. Royster*, 410 U.S. 263, 276, 93 S.Ct. 1055, 1062–63, 35 L.Ed.2d 282, 292 (1973), which articulated a traditional, deferential formulation of the rational basis standard. And although *Reed* was later recognized as the seminal case of the intermediate scrutiny standard, it was not immediately *so* perceived. *See generally* Gunther, *Foreward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv.L.Rev. 1, 30–36 (1972); Redish, *Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications*, 55 Texas L.Rev. 759, 771–73 (1977). On its face, *Reed* purported to be merely another rational basis case, and was clearly so understood by this court in *Chayklintaste*[4]. More important, *Chayklintaste* was probably not even decided under the Texas Constitution. While a review of the entire file reveals that plaintiff asserted both state and federal equal protection grounds, the opinion itself relied solely on federal authorities and did not expressly refer to either constitution.

**3.** On remand in *Aladdin,* an unanimous panel of the Fifth Circuit determined that no independent Texas equal protection standard exists. Slip Op. 15958. This opinion was vacated on rehearing, however, because the Supreme Court had remanded the cause only for clarification as to the grounds for the original opinion, not for a redetermination of the adequacy of any independent state grounds. 713 F.2d 137 (1983). The Supreme Court thereafter denied the City's motion to recall the Supreme Court's judgment. 464 U.S. 927, 104 S.Ct. 329, 78 L.Ed.2d 300 (1983).

**4.** The standard in *Reed* was taken from *F.S. Royster Guano v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561–62, 64 L.Ed. 989, 990 (1920), a Supreme Court case from the now discredited era of intense judicial activism in social and economic spheres. Authored by Justice Pitney, with both Justices Brandeis and Holmes in dissent, *Royster Guano* was not cited in any majority opinion of the Court between 1938 and 1957. Its obscurity in the lower courts was even more striking, it being cited only once in the Federal Reporter and twice in the Federal Supplement between 1936 and 1970.

With the emergence of the modern rational basis standard, *Royster Guano* was occasionally cited as an example of minimal scrutiny. *See Allied Stores of Ohio, Inc. v. Bowers,* 358 U.S. 522, 527, 79 S.Ct. 437, 441, 3 L.Ed.2d 480, 485 (1959); *Morey v. Doud,* 354 U.S. 457, 465, 77 S.Ct. 1344, 1350, 1 L.Ed.2d 1485, 1491 (1957). After *Reed,* it was cited more frequently by both state and federal courts, particularly in gender classification cases. *E.g., Johnson v. Robison,* 415 U.S. 361, 374–75, 94 S.Ct. 1160, 1169, 39 L.Ed.2d 389, 402 (1974); *Stanton v. Stanton,* 421 U.S. 7, 14, 95 S.Ct. 1373, 1377, 43 L.Ed.2d 688, 694 (1975); *Craig v. Boren,* 429 U.S. 190, 211, 97 S.Ct. 451, 464, 50 L.Ed. 397, 408 (1976) (Powell, J., concurring). No Supreme Court justice, however, acknowledged any distinction between *Royster Guano* and less restrictive formulations of the rational basis test until after *Reed. See U.S.R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 174–75, 101 S.Ct. 453, 459, 66 L.Ed. 368, 375–76 (1980); *Moore v. City of East Cleveland,* 431 U.S. 494, 551, 97 S.Ct. 1932, 1962, 52 L.Ed.2d 531, 569–70 (1977) (White, J., dissenting); *Trimble v. Gordon,* 430 U.S. 762, 784–85, 97 S.Ct. 1459, 1472, 52 L.Ed.2d 31, 48–49 (1977) (Rehnquist, J., dissenting); *Cruz v. Beto,* 405 U.S. 319, 326 n. 4, 92 S.Ct. 1079, 1083 n. 4, 31 L.Ed.2d 263, 270 n. 4 (1972) (Rehnquist, J., dissenting). No majority opinion of the Court acknowledged *Royster Guano* as a statement of middle-tier scrutiny until *Caban v. Mohammed,* 441 U.S. 380, 391, 99 S.Ct. 1760, 1767, 60 L.Ed.2d 297, 306 (1979), more than three years after this court decided *Chayklintaste.*

Even after *Caban,* some justices still have regarded the language of *Royster Guano* as a valid statement of the rational basis test. *See Zablocki v. Redhail,* 434 U.S. 374, 400, 98 S.Ct. 673, 688, 54 L.Ed.2d 618, 639 (1978) (Powell, J., concurring); *U.S.R.R. Retirement Bd. v. Fritz,* 449 U.S. at 184, 101 S.Ct. at 464, 66 L.Ed.2d at 382 (Brennan, J., dissenting). As Justice Powell stated in citing *Royster Guano* in his dissent in *Schweiker v. Wilson,* 450 U.S. 221, 243, 101 S.Ct. 1074, 1087, 67 L.Ed.2d 186, 203 (1981):

Members of this Court continue to hold divergent views on the clarity with which a legislative purpose must appear [citations omitted], and about the degree of deference afforded the legislature in suiting means to ends [citations omitted].

*See also City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. at 296, 297, 102 S.Ct. at 1078, 1079, 71 L.Ed.2d at 164, 165 (Powell and White, JJ., separately dissenting).

This background refutes the suggestion of the Supreme Court that this court's citation to *Reed* in *Chayklintaste* might demonstrate the adoption of a stricter level of scrutiny under the Texas Constitution.

The remaining argument for the proposition that Texas has established an independent standard of equal protection review under the Texas Constitution comes from two opinions decided on the same day: *Whitworth v. Bynum*, 699 S.W.2d 194 (Tex.1985), and *Spring Branch I.S.D. v. Stamos*, 695 S.W.2d 556 (Tex.1985). The court's opinion in *Whitworth*, it is true, did refer cryptically to a "Texas version of the rational basis test." 699 S.W.2d at 197. As articulated, however, this "version" stood only for the entirely unremarkable propositions that classifications must be "rationally related" to a "legitimate state interest" and that "similarly situated individuals must be treated equally under the statutory classification unless there is a rational basis for not doing so." *Id.* These are classic formulations of traditional minimal scrutiny. *Stamos*, on the other hand, expressly drew upon both state and federal authority in describing Texas equal protection review. While both *Whitworth* and *Stamos* relied heavily on this court's decision in *Sullivan v. University Interscholastic League*, 616 S.W.2d 170 (Tex. 1981), that reliance does not indicate the creation of a new standard.[5] *Sullivan* was based solely on the equal protection clause of the Fourteenth Amendment to the United States Constitution; no violation of the Texas Constitution was even alleged in that case. Our subsequent reliance on *Sullivan* thus only reinforces the traditional deference of this court to federal standards when applying the equal protection clause of the Texas Constitution. While some members of the court might want to create a separate standard, *see LeCroy v. Hanlon*, 713 S.W.2d at 338; *Whitworth v. Bynum*, 699 S.W.2d at 197 n. 5; Kilgarlin, *Equal Protection Under the Texas Consti-*

*tution*, Tex. Legal Services Center Alert (August 1987), at 16; Harrington, *The Texas Bill of Rights and Civil Liberties*, 17 Tex.Tech.L.Rev. 1487, 1517–19 (1986), any such standard has not been sufficiently articulated to permit its application to other cases.

I, therefore, reject the notion that Texas has devised an independent equal protection analysis. This conclusion is supported by language from most of the recent decisions of our courts. *See, e.g., State v. Project Principle*, 724 S.W.2d 387, 391 (Tex.1987); *Vasquez v. State*, 739 S.W.2d 37, 43 (Tex.Crim.App.1987); *Twiford v. Nueces County Appraisal Dist.*, 725 S.W. 2d 325, 328 n. 5 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.); *Aransas County Appraisal Review Bd. v. Texas Gulf Shrimp Co.*, 707 S.W.2d 186, 195–96 (Tex. App.—Corpus Christi 1986, writ ref'd n.r. e.); *Massachusetts Indem. & Life Ins. Co. v. Texas State Bd. of Ins.*, 685 S.W.2d 104, 109–10 (Tex.App.—Austin 1985, no writ). If an independent standard is articulated in the future, it must be by a forthright declaration from a majority of this court, not by a sporadic suggestion or implication.

When and if this court announces an independent equal protection standard, I trust that we will do so with a full appreciation for the loss of uniformity, legitimacy, flexibility, certainty, and economy which judicial activism imposes. *See Developments in the Law*, 95 Harv.L.Rev. at 1357– 58, 1460–63, Maltz, *The Dark Side of State Court Activism*, 63 Texas L.Rev. 995 (1985). For now, I am satisfied with the balance struck by the three-tiered federal approach. From the "isolated vantage of the litigation process," judges are especially ill-equipped to set aside the people's

---

5. *Sullivan*, while purporting to apply only minimal scrutiny under the United States Constitution, struck down a state-imposed rule barring an underclass transfer student from participating in varsity sports for one year because its irrebuttable classifications made it "overbroad and overinclusive." 616 S.W.2d at 173. Since the Supreme Court has been tolerant of overinclusive legislation under minimal scrutiny, *e.g.*, *Vance v. Bradley*, 440 U.S. 93, 108, 99 S.Ct. 939, 948, 59 L.Ed.2d 171, 183 (1979); *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d

491 (1970); *Rinaldi v. Yeager*, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966), the "strict equal protection analysis" of *Sullivan*, 616 S.W. 2d at 173, is reminiscent of intermediate scrutiny. *See* L. Tribe, *American Constitutional Law* 1603–04. Therefore, *Sullivan* apparently departed from settled federal constitutional principles in reaching its result. *See* Harrington, *The Texas Bill of Rights and Civil Liberties*, 17 Tex. Tech L.Rev. 1487, 1518 (1986); *see generally* 2 R. Rotunda, *Constitutional Law* 248.

legislatively expressed will except where the potential for majoritarian abuse may have compromised our most precious rights or discriminated against traditionally oppressed groups. *See generally* D. Horowitz, *The Courts and Social Policy* 45–51, 274–84 (1977). This court has served our state well by deferring to the federal standard when interpreting the Texas equal protection clause.

The Fifth Circuit has already determined that minimal scrutiny applies to this case under federal equal protection analysis and that the cap withstands equal protection analysis under that scrutiny. As far as this lawsuit is concerned, my conclusion that federal and state equal protection doctrines are identical should foreclose further discussion of this issue. To answer the Fifth Circuit's certified question, however, we must ourselves determine the constitutionality of the statute in a manner that will apply to future cases in this state. Therefore, I feel constrained to make an independent determination of constitutionality under the state equal protection clause. In so doing, I believe it is appropriate to rely on both Texas and federal authorities.

I return, then, to the initial inquiry: the appropriate level of scrutiny. For the reasons discussed below, I agree with the Fifth Circuit and with the dissent of Justice Gonzalez that minimal scrutiny is appropriate.

One amicus curiae suggests that strict scrutiny should apply because the statute affects access to the courts and trial by jury. Both of these rights are alleged to be fundamental because they appear in our Constitution, TEX. CONST. art. I, §§ 13 and 15, and "fundamental rights have their genesis in the express and implied provisions of personal liberty recognized in the federal and state constitutions." *Spring Branch I.S.D. v. Stamos*, 695 S.W.2d at 560. Other commentators have suggested that the interest in personal security and bodily integrity accompanying the right to

sue for personal injuries is fundamental. *See* Note, *The Fairness and Constitutionality of Statutes of Limitations for Toxic Tort Suits*, 96 Harv.L.Rev. 1683, 1693–94, 1697 n. 63, 1701 (1983); Witherspoon, *Constitutionality of the Texas Statute Limiting Liability for Medical Malpractice*, 10 Tex.Tech L.Rev. 419, 453, 462 (1979).

These arguments are unpersuasive. Not every constitutional right or remedy triggers heightened equal protection review. Only those fundamental liberty rights "of basic importance in our society" have been accorded such status. *Boddie v. Connecticut*, 401 U.S. 371, 374, 91 S.Ct. 780, 784, 38 L.Ed.2d 113, 116–17 (1971). The right to jury trial is not a fundamental right under the United States Constitution, as that right has not been extended to the states by incorporation in the due process clause of the Fourteenth Amendment. *Minneapolis & St. Louis R.R. Co. v. Bombolis*, 241 U.S. 211, 36 S.Ct. 595, 60 L.Ed. 961 (1916). Access to the courts is also not a fundamental right unless the denial of that access itself impinges on a recognized fundamental right. *See, e.g., Ortwein v. Schwab*, 410 U.S. 656, 658–60, 93 S.Ct. 1172, 1172–75, 35 L.Ed.2d 572, 76 (1973) (access to courts to seek welfare relief not a fundamental right). Being grounded in the common law, not the constitution, the right to receive compensation for tortious injury is simply not fundamental. *See, e.g., Brown v. Merlo*, 8 Cal.3d 855, 882, 106 Cal.Rptr. 388, 407, 506 P.2d 212, 231 (1973). Those few states which have applied strict scrutiny in a similar context are simply outside the mainstream of state constitutional jurisprudence. *See, e.g., Kenyon v. Hammer*, 142 Ariz. 69, 83, 688 P.2d 961, 973 (1984) (holding that right of access to recover damages for bodily injury was fundamental, but noting that numerous other states have held otherwise).[6] Under Texas case law, as in most states, there is simply no basis for applying strict scrutiny to this type of legislation. *See* Smith, *Battling a Receding Tort Frontier: Constitutional*

---

**6.** The result in Arizona is probably explained by the express provision in its Constitution that "the right of action to recover personal injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation." ARIZ. CONST. art. 18, § 6.

*Attacks on Medical Malpractice Laws,* 38 Okla.L.Rev. 195, 204–05, 210–11 (1985).

The Lucases and all remaining aligned amici contend that some less restrictive form of heightened scrutiny is appropriate. The principal reason offered, that Texas has extended heightened scrutiny to all classifications, is without merit. A secondary argument also advanced is that the interests affected are sufficiently important to justify intermediate review. One amicus argues that "in a case involving a denial of longstanding common law rights, [the] court should adopt a stricter standard for constitutional review than the rational basis test." No federal or Texas case, however, has ever suggested that heightened scrutiny is appropriate in this area. *See, e.g., Duke Power Co. v. Carolina Envt'l Study Group, Inc.,* 438 U.S. 59, 83, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595, 627 (1978) (upholding the constitutionality of the $560 million limitation on total liability for nuclear accidents, and describing the limitation as "a classic example of economic regulation"). Unless the common law is to be elevated to constitutional significance, I can see no reason for so holding now.[7]

The rational basis test, in my opinion, provides the appropriate level of scrutiny for the provisions in question. Under this standard, the provisions clearly pass constitutional muster.[8] It is obvious that a ceiling on maximum recovery of damages is rationally related to the stated and legitimate legislative goals of reducing excessive severity of health care liability claims, decreasing the cost of those claims, making insurance at reasonably affordable rates available to health care providers, and making affordable health care more accessible and available to the public. TEX.REV. CIV.STAT. art. 4590i, § 1.02(b). *See Rose v. Doctors Hosp. Facilities,* 735 S.W.2d 244, 250–54 (Tex.App.—Dallas 1987, writ granted). Neither the Lucases nor any amici curiae, in fact, asserts that the caps violate equal protection under a rational relationship analysis. Even though some state courts, including those of Texas, have on occasion seemed more amenable than federal courts to striking down statutory classifications under minimal scrutiny, *see, e.g., San Antonio Retail Grocers v. Lafferty,* 156 Tex. 574, 297 S.W.2d 813 (1957); *Developments in the Law,* 95 Harv.L.Rev. at 1463–93, the courts of last resort in every state where the rational basis test has been employed have upheld malpractice caps against equal protection challenges. *See Fein v. Permanente Medical Group,* 38 Cal.3d 137, 161–64, 211 Cal.Rptr. 368, 385–87, 695 P.2d 665, 682–84 (1985); *Johnson v. St. Vincent Hosp., Inc.,* 273 Ind. 374, 391–93, 404 N.E.2d 585, 600–01 (1980)

---

**7.** It is true that courts in three other states have applied intermediate scrutiny to somewhat similar statutes involving medical malpractice damages limitations. *Jones v. State Bd. of Medicine,* 97 Idaho 859, 870–71, 555 P.2d 399, 410–11 (1976), *cert. denied,* 431 U.S. 914 (1977); *Carson v. Mauer,* 120 N.H. 925, 933–34, 424 A.2d 825, 830–31 (1980); *Arneson v. Olson,* 270 N.W.2d 125, 132–33 (N.D.1978). I find none of these cases persuasive.

In *Jones,* the Idaho Supreme Court determined the appropriate level of scrutiny under both the state and federal constitutions not by examining the rights involved or classes affected, but by concluding that it did not like the statute in question. 97 Idaho at 871, 555 P.2d at 411. In *Carson,* the New Hampshire Supreme Court acknowledged that it applied intermediate scrutiny under its Constitution not only to those categories enunciated by the federal courts, "but also in examining economic and social legislation which did not involve distinctions based upon gender or illegitimacy." 120 N.H. at 928, 424 A.2d at 831. In *Arneson,* the North Dakota

Supreme Court applied intermediate scrutiny under both the state constitution and the Fourteenth Amendment without any meaningful analysis. 270 N.W.2d at 133, 135–136.

**8.** The courts of our state, like the federal courts, have articulated the rational basis test in varying ways. *Compare Spring Branch I.S.D. v. Stamos,* 695 S.W.2d at 559, *with Friedman v. American Surety Co.,* 137 Tex. 149, 160, 151 S.W.2d 570, 577 (1941). These textual distinctions, however, have generally had little effect on the result of the cases. In fact, our courts have frequently combined two or more seemingly disparate standards when articulating the rational basis standard. *See, e.g., Texas Woman's Univ. v. Chayklintaste, supra; Railroad Comm'n v. Miller,* 434 S.W.2d 670, 673 (Tex.1968); *University Interscholastic League v. North Dallas Chamber of Commerce Soccer Ass'n.,* 693 S.W.2d 513, 516–17 (Tex.Civ.App.—Dallas 1985, no writ); *Crawford Chevrolet, Inc. v. McLarty,* 519 S.W.2d 656, 661 (Tex.Civ.App.—Amarillo 1975, no writ).

(semble); *Prendergast v. Nelson*, 199 Neb. 97, 113–14, 256 N.W.2d 657, 667–69 (1977). I, therefore, agree with the dissenting opinion of Justice Gonzalez that the cap does not violate equal protection under the Texas Constitution.

### Right to Jury Trial

Several amici curiae suggest that the cap violates the right to trial by jury provision of the Texas Constitution, which provides, in part:

> The right to trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency.
>
> . . . .

TEX. CONST. art. I, § 15.[9] I disagree.

I acknowledge that the Texas guarantee of right to trial by jury is much broader than the guarantee afforded under the Seventh Amendment to the United States Constitution to civil litigants in federal courts.[10] The Texas Constitution has been held by this court to protect "the right to trial by jury in those cases where a jury would have been proper at common law," or "where that right existed at the time the Constitution was adopted," *State v. Credit Bureau of Laredo, Inc.*, 530 S.W.2d 288, 291 (Tex.1975), including "cases of a similar character arising under statutes enacted subsequently to the adoption of our Constitution." *White v. White*, 108 Tex. 570, 581, 196 S.W. 508, 512 (1917).

Our Constitution, however, cannot be read so expansively as to preclude any modification of the remedies available under those common law rights. Although our courts have zealously guarded the right to trial by jury, *see, e.g., White v. White, supra*, (statute requiring adjudication of sanity by commission of physicians instead of jury held unconstitutional); *Central & Montgomery R.R. Co. v. Morris &*

*Crawford*, 68 Tex. 49, 61, 3 S.W. 457, 462 (1887) (statute requiring court instead of jury adjudication of plaintiff's damages after defendant's default held unconstitutional); *Hatten v. City of Houston*, 373 S.W.2d 525, 535 (Tex.Civ.App.—Houston 1963, writ ref'd n.r.e.) (statute requiring adjudication of validity of water system revenue bonds and proceedings incident to the issuance thereof by court instead of jury held unconstitutional), that right is satisfied if access to some determination of disputed issues of fact by a jury is preserved. Since the caps do not destroy a plaintiff's right to a jury resolution of a justiciable controversy, they do not violate the right to trial by jury.

This court upheld a far more radical modification of common law remedies in *Middleton v. Texas Power & Light Co.*, 108 Tex. 96, 185 S.W. 556 (1916), when it found the Texas Workmen's Compensation Act constitutional. The court said:

> Nor does the Act impair the right of trial by jury. Trial by jury cannot be claimed in an inquiry that is non-judicial in its character, or with respect to proceedings before an administrative board. The Accident Board charged with the administration of the Act is ... not a court. In its determination of disputed claims there could be no right to a jury trial. The Act authorizes appeals from the decisions of the Board to the courts, where a jury trial of the matters in dispute, under the law as embodied in the Act, may be had.

108 Tex. at 111, 185 S.W. at 561–62. Thus, Texas joined virtually every other state in holding that access to a jury at some stage for resolution of some claims was sufficient for the compensation scheme to pass constitutional muster. *See, e.g., Deibeikis v. Link Belt Co.*, 261 Ill. 454, 466, 104 N.E. 211, 216 (1914); *Hunter v. Colfax Consol. Coal Co.*, 175 Iowa 245, 325–27, 154 N.W. 1037, 1065–67 (1915).

*Louis R.R. Co. v. Bombolis, supra*, our courts almost never seek guidance from federal authorities in interpreting this provision of our Constitution. *But see Rutledge v. Rutledge*, 720 S.W.2d 633, 635 (Tex.App.—Fort Worth 1986, no writ).

9. *See also* TEX. CONST. art. V, § 10.

10. Because of our substantially broader protections, and because protections of the Seventh Amendment have not been extended to the states through the due process clause of the Fourteenth Amendment, *Minneapolis & St.*

Courts in at least three jurisdictions have, however, held that malpractice caps infringe upon the constitutional right to jury trial. In *Boyd v. Bulala*, 647 F.Supp. 781, 789 (W.D.Va.1986), a federal court found the Virginia cap unconstitutional under both the United States and Virginia Constitutions, stating in part:

Since the assessment of damages is a fact issue committed to the jury for resolution, a limitation on the performance of that function is a limitation on the role of the jury....

. . . . .

... This extraordinary requirement bears no relation to the doctrines of *remittitur*, new trial, and judgment notwithstanding the verdict, and it cannot be founded upon the court's inherent power over verdicts and judgments. Indeed, there exists no permissible basis for entering a judgment predetermined by the legislature in place of a judgment on a verdict properly reached by a jury.

(emphasis original). *See also Smith v. Department of Ins.*, 507 So.2d 1080, 1088–89 (Fla.1987); *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 757 P.2d 251 (1988).

These arguments prove too much. If the Legislature cannot limit a jury's award in one case, then neither can it increase a jury's award in another. Under the analysis of *Boyd*, accepted remedial measures such as multiple damages for knowing statutory violations, *see, e.g.*, TEX.INS.CODE art. 21.21, § 16(b)(1), would also clearly fall.

If the separation of powers is to be meaningful, the legislative branch of government must have authority to pass laws which alter the availability and scope of remedies. To hold otherwise would eviscerate the Legislature's ability "to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances." *Munn v. Illinois*, 94 U.S. 113, 134, 24 L.Ed. 77, 87 (1876). *See also Silver v. Silver*, 280 U.S. 117, 122, 50 S.Ct. 157–58, 74 L.Ed. 221, 224–25 (1929). Thus, our Legislature has from time to time not only limited common

law remedies, as with the passage of the Workers' Compensation Act, but abolished them altogether, as in the recent repeal of actions for criminal conversation, TEX. FAM.CODE § 4.05, and alienation of affections. TEX.FAM.CODE § 4.06. Such legitimate governmental activity does not invade the right to trial by jury. *See Coulter v. Melady*, 489 S.W.2d 156, 159 (Tex. Civ.App.—Texarkana 1972, writ ref'd n.r.e.) (right to jury trial not infringed by statutory provision which eliminated plaintiff's right to challenge relative's marriage by showing lack of consent).

Accordingly, I would hold that the cap does not violate the right to jury trial provision of the Texas Constitution. *See Johnson v. St. Vincent Hosp., Inc.*, 273 Ind. 374, 391, 404 N.E.2d 585, 602 (1980) (malpractice caps held not to violate right to jury trial under Indiana Constitution).

### Due Course of Law

Two amici curiae aligned with the Lucases also contend that the cap violates the due process guarantee of the Texas Constitution, which provides as follows:

No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

TEX. CONST. art. I, § 19. This section is the "traditional due process guarantee," corresponding to the due process guarantee of the Fourteenth Amendment to the United States Constitution. *See Sax v. Votteler*, 648 S.W.2d at 664.

Both the federal and state due process clauses originated as a guarantee of procedural fairness. TEX. CONST. art. I, § 19 interpretive commentary. American courts, however, have long imparted a substantive meaning to the language as well. When legislation goes beyond the proper sphere of government activity, "any life, liberty or property limited by such a law is taken without due process because the Constitution never granted the government the ability to pass such a law." 2 R. Rotunda, *Treatise on Constitutional Law* 14.

For many years, the United States Supreme Court applied substantive due process analysis quite expansively. By requiring legislation to bear "a real and substantial relation to the public health, safety, morals, or some other phase of the general welfare," *Louis K. Liggett Co. v. Baldridge*, 278 U.S. 105, 112, 49 S.Ct. 57, 59, 73 L.Ed. 204, 208 (1928), the Court struck down hundreds of state and federal laws between 1897 and 1937. L. Tribe, *American Constitutional Law* 567 n. 2. This unprecedented judicial usurpation of public policy choices was vigorously decried at the time, and public confidence in the judicial process was severely compromised. As Justice Holmes explained in his famous dissent in *Lochner v. New York*, 198 U.S. 45, 75, 76, 25 S.Ct. 539, 546, 547, 49 L.Ed. 937, 949 (1905):

> This case is decided upon an economic theory which a large part of the country does not entertain. If it were a question whether I agreed with that theory, I should desire to study it further and long before making up my mind. But I do not conceive that to be my duty, because I strongly believe that my agreement or disagreement has nothing to do with the right of a majority to embody their opinions in law.... [A] Constitution is not intended to embody a particular economic theory.... It is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar, or novel, and even shocking, ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States.

History has vindicated Justice Holmes and the advocates of judicial restraint. Since the Supreme Court abandoned its intrusive stance more than fifty years ago, it has not used the due process clause even once to strike down social or economic legislation. Under federal due process, where fundamental interests are not affected, a statute will be upheld if it merely bears a rational relationship to a legitimate state interest. *See Ferguson v. Skrupa*, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963).

Some contend, however, that our state due course provision is more rigorous than federal due process. In *State v. Richards*, 157 Tex. 166, 171, 301 S.W.2d 597, 602 (1957), for example, this court apparently departed from federal standards in describing the requirements of substantive due process as follows:

> The line where the police power of the state encounters the barrier of substantive due process is not susceptible of exact definition. As a general rule the power is commensurate with, but does not exceed, the duty to provide for the real needs of the people in their health, safety, comfort and convenience as consistently as may be with private property rights.... A large discretion is necessarily vested in the Legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests. If there is room for a fair difference of opinion as to the necessity and reasonableness of a legislative enactment on a subject which lies within the domain of the police power, the courts will not hold it void. [Citations omitted].

More frequently, however, this court has relied on both state and federal authorities in discussing our due course clause. *See, e.g., Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140–41 (Tex.1977); *Thompson v. Calvert*, 489 S.W.2d 95, 99 (Tex.1972). A substantial number of Texas cases, in fact, have held or implied that the federal due process and state due course clauses are, as to some or all of their facets, identical. *See, e.g., Ex parte Jimenez*, 159 Tex. 183, 189, 317 S.W.2d 189, 194 (1958), *Mabee v. McDonald*, 107 Tex. 139, 148–49, 175 S.W. 676, 680 (1915) (plurality opinion), *rev'd on other grounds*, 243 U.S. 90, 37 S.Ct. 343, 61 L.Ed. 608 (1917); *Lively v. Missouri K. & T. Ry. Co.*, 102 Tex. 545, 558–59, 120 S.W. 852, 856 (1909); *Mellinger v. City of Houston*, 68 Tex. 37, 44–45, 3 S.W. 249, 252–53 (1887); *Ex parte Martinez*, 742 S.W.2d 289, 291 (Tex.Cr.App.1987); *Smith v. State*, 683 S.W.2d 393, 399 n. 2 (Tex.Cr.App.1984); *Lindsay v. Papageorgiou*, 751 S.W.2d 544, 550 (Tex.App.—Houston [1st Dist.] 1988,

writ pending); *Price v. City of San Marcos,* 744 S.W.2d 349, 351 (Tex.App.—Austin 1988, writ denied); *Richards v. State,* 743 S.W.2d 747, 749 (Tex.App.—Houston [1st Dist.] 1987, pet. ref'd); *Massachusetts Indem. & Life Ins. Co. v. Texas State Bd. of Ins.,* 685 S.W.2d 104, 113 (Tex.App.—Austin 1985, no writ); *Thompson v. Texas State Bd. of Medical Examiners,* 570 S.W.2d 123, 126–29 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r.e.); *Texas Optometry Bd. v. Lee Vision Center, Inc.,* 515 S.W.2d 380, 386 (Tex.Civ.App.—Eastland 1974, writ ref'd n.r.e.); *Eschrich v. Williamson,* 475 S.W.2d 380, 381 (Tex.Civ.App.—Beaumont 1972, writ ref'd n.r.e.); *State v. Rope,* 419 S.W.2d 890, 896 (Tex.Civ.App.—Austin 1967, writ ref'd n.r.e.); *Hainsworth v. Martin,* 386 S.W.2d 202, 205 (Tex.Civ.App.—Austin 1965, writ ref'd n.r.e.), *vacated as moot,* 382 U.S. 109, 86 S.Ct. 256, 15 L.Ed.2d 190 (1965). Some decisions have discussed both clauses without distinction. *See, e.g., State v. Project Principle, Inc.,* 724 S.W.2d 387, 390–91 (Tex.1987); *House of Tobacco, Inc. v. Calvert,* 394 S.W.2d 654, 657–58 (Tex.1965).

In contrast, only a handful of recent opinions have suggested that the Texas clause has any independent meaning. *See, e.g., Ex parte Cruz,* 739 S.W.2d 53, 61–63 (Tex.Crim.App.1987) (Duncan, J., dissenting); *Wright v. State,* 640 S.W.2d 265, 269 n. 12 (Tex.Crim.App.1982); *Ex parte Coleman,* 599 S.W.2d 305, 309 (Tex.Crim.App.1979) (on rehearing) (Phillips, J., dissenting); *Yorko v. State,* 681 S.W.2d 633, 636 (Tex.App.—Houston [14th Dist.] 1984), *aff'd,* 690 S.W.2d 260 (Tex.Crim.App.1985). A majority of a panel of the Fifth Circuit found that Texas has an independent due process standard, but the only Texas judge on the panel dissented and the opinion was subsequently vacated.[11] Commentators, like judges, also appear divided as to the viability of substantive due process in Texas. *See* Hart, *The Bill of Rights: Safeguard of Individual Liberty,* 35 Texas L.Rev. 919, 921 n. 7 (1957); 1 *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 68–72 (G.

Braden ed. 1977) (no independent Texas development of substantive due process); Harrington, *Texas Bill of Rights,* 17 Tex. Tech L.Rev. at 1527–28. This confusion is not unique to our state, but appears common to many jurisdictions. *See, e.g.,* Howard, *State Courts and Constitutional Rights in the Day of the Burger Court,* 62 Va.L.Rev. 873, 882–891 (1976); Kirby, *Expansive Judicial Review of Economic Regulation under State Constitutions: The Case for Realism,* 48 Tenn.L.Rev. 241 (1981); Paulsen, *The Persistence of Substantive Due Process in the States,* 34 Minn.L.Rev. 91 (1950).

As I have previously discussed, state courts can and many times do give independent meaning to state constitutional provisions. In the interests of uniformity and consistency, however, I believe that state courts should normally defer to federal interpretations of similar constitutional provisions. *See, e.g., Developments in the Law,* 95 Harv.L.Rev. at 1356–66. I find nothing in the text of our provision, the intention of the framers or ratifiers, the difference in constitutional structure, or the local concerns, traditions, or public attitudes of our citizens to justify a different interpretation of the state due course clause. *See State v. Hunt,* 91 N.J. 338, 362–68, 450 A.2d 952, 964–67 (1982) (Handler, J., concurring). I also find nothing in our judicial selection system, constitutional amendment procedure, or legislative process to suggest a different result. *See* McGovern, *The Variety, Policy and Constitutionality of Product Liability Statutes of Repose,* 30 Am.U. L.Rev. 579, 601 (1981). In the words of Professor Howard:

> Judicial review, even when exercised by elected judges, is never without an antidemocratic flavor. When judges invalidate a legislative act, however correct that judgment, they are thwarting an expression of popular will.

Howard, *State Courts and Constitutional Rights,* 62 Va.L.Rev. at 941. The constitutional amendment procedure, while frequently used in Texas, has been used to make only one significant change in our

---

**11.** *See* n. 4 above.

Bill of Rights since 1876.[12] Finally, I believe that all courts at all levels of government must respect the integrity of the legislative process. *See generally Ex parte Hughes,* 133 Tex. 505, 129 S.W.2d 270 (1939); *In re House Bill No. 537 of the Thirty-eighth Legislature,* 113 Tex. 367, 256 S.W. 573 (1923).

Although an independent due course standard may have been applied by this court on occasion, it is not firmly established in Texas jurisprudence. Because I find no sound policy justification for an independent test, *see generally,* Howard, *State Courts and Constitutional Rights,* 62 Va.L.Rev. at 935–40; Smith, *Constitutional Attacks,* 38 Okla.L.Rev. at 208, I would defer to the federal standard in applying the Texas due course clause.

Ultimately, though, the choice of standards probably makes little difference. Even if the language of *State v. Richards* does constitute an independent Texas standard, the cap in question will withstand due process scrutiny. There is clearly at least "room for a fair difference of opinion as to the necessity and reasonableness" of the cap in providing for "the real needs of the people." 157 Tex. at 170, 301 S.W.2d at 602. Under the more deferential federal

test, it is even clearer it is rationally related to legitimate state interests in greater availability of medical care to more citizens at lower cost.[13] I, therefore, agree with the dissent of Justice Gonzalez that neither section 11.02 nor section 11.03 violates due course of law.

### Special Laws

Although neither the plaintiffs nor any amicus has raised this issue, the court suggests that the cap might violate the local and special laws section of the Texas Constitution, which provides in part:

[I]n all ... cases where a general law can be made applicable, no local or special law shall be enacted....

TEX. CONST. art. III, § 56. I agree with the analysis of Justice Gonzalez that it does not violate this section.

### Open Courts

The plaintiffs and all aligned amici allege that the cap violates the second due process provision in the Texas Constitution, the so-called open courts provision. It provides in part.

All courts shall be open, and every person for an injury done him, in his lands,

---

**12.** Except for the Equal Rights Amendment of 1972, TEX. CONST. art. I, § 3a, all changes to the Bill of Rights have been "narrow, statute-like amendments." 1 *The Constitution of the State of Texas* 2 (G. Braden ed.).

**13.** I strongly reject the notion advanced by at least one amicus that the caps violate due course because the statute provides no alternative remedy to injured plaintiffs. The courts have not imposed such a requirement under the federal due process clause. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 88, 98 S.Ct. 2620, 2638, 57 L.Ed.2d 595, 620 (1978); *New York Cent. R.R. v. White,* 243 U.S. 188, 201, 37 S.Ct. 247, 252, 61 L.Ed. 667, 674 (1917). A quid pro quo requirement may have some appeal when fundamental rights are affected, *see* Note, *The Fairness and Constitutionality of Statutes of Limitations for Toxic Tort Suits,* 96 Harv.L.Rev. 1683, 1691 (1983), or even where "core" common law rights are abolished, *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 94, 100 S.Ct. 2035, 2047, 64 L.Ed.2d 741, 760 (1980) (Marshall, J., concurring), but its application to every attempted modification of the common law would surely stultify the law. As

the Court noted in *Silver v. Silver,* 280 U.S. 117, 122, 50 S.Ct. 57, 58, 74 L.Ed. 221, 225 (1929), in upholding the Connecticut automobile guest statute against due process attack: "The Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object." A more rigid standard would, by elevating mere common law actions or defenses to the level of constitutional rights, destroy "the creative potential of the common law." Redish, *Legislative Response,* 55 Texas L.Rev. at 787.

The better rule, therefore, rejects any universal quid pro quo requirement under due process. *See, e.g., Montgomery v. Daniels,* 38 N.Y. 2d 41, 378 N.Y.S.2d 1, 340 N.E.2d 440 (1975) (upholding New York no fault statute). Most states have rejected arguments that substantive due process requires a quid pro quo when medical malpractice awards are legislatively capped. *See Fein,* 695 P.2d 665, 679–82 (Cal.1985); *Arneson,* 270 N.W.2d 125, 134 (N.D.1978); *Prendergast,* 256 N.W.2d 657, 671 (Neb.1977); *Jones,* 555 P.2d 399, 406 (Idaho 1976); *but see Simon v. St. Elizabeth Medical Center,* 3 O.O.3d 164, 170–72, 355 N.E.2d 903, 910 (1976).

goods, person or reputation, shall have remedy by due course of law. TEX. CONST. art I, § 13. Although there is no similar provision in the federal constitution, a majority of state constitutions contain substantially identical guarantees. These guarantees are also variously known as remedy, certain remedy, right to remedy, remedy for injury, access to courts and open access to courts provisions.

The language of the open courts guarantee apparently originated in Sir Edward Coke's gloss on chapter 29 of the 1225 Magna Carta, the successor to chapter 40 of the 1215 Magna Carta. E. Coke, *The Second Part of the Institutes of the Laws of England pt. I* 53–56 (1642). A similar provision first appeared in this country in the 1683 Charter of Liberty for Pennsylvania. Among those principles traceable to Magna Carta, only the due process guarantee itself has had a greater impact on American Constitutional law. A.E. Howard, *The Road from Runnymede* 284 (1968).

While it is universally agreed that the open courts provision guarantees a right of access to the courts, there is great divergence among the various states regarding the extent, if any, to which it accords constitutional protection to existing substantive remedies. *See* McGovern, *The Variety, Policy and Constitutionality of Product Liability Statutes of Repose*, 30 Am.U. L.Rev. 579, 615–18 (1981); Note, *Constitutional Guarantees of a Certain Remedy*, 49 Iowa L.Rev. 1202 (1964); Note, *Constitutional Law—Due Process—Impairment of Contracts—Validity of State Statute Abolishing Actions for Alienation of Affections and Criminal Conversation*, 22 Minn.L.Rev. 104 (1937).

In many states, for example, the provision is nothing more than a procedural guarantee of judicial availability. *See, e.g., O'Quinn v. Walt Disney Productions, Inc.*, 177 Col. 190, 195, 493 P.2d 344, 346 (1972); *Twin Falls Clinic & Hosp. Bldg. Corp. v. Hamill*, 103 Idaho 19, 24, 644 P.2d 341, 346 (1982); *Johnson v. St. Vincent Hosp., Inc.*, 273 Ind. 374, 404 N.E.2d at 594 (Ind.1980); *Prendergast v. Nelson*, 199

Neb. 97, 103–06, 256 N.W.2d 657, 663–65 (1977); *Freezer Storage, Inc. v. Armstrong Cork Co.*, 476 Pa. 270, 279–81, 382 A.2d 715, 720–21 (1978).

A greater number of states, however, appear to place some substantive restrictions on the legislature's authority to abolish or restrict well-established remedies and defenses, particularly common law causes of action. *See* Comment, *Section 13: Constitutional Armor for the Common Law*, 35 Ala.L.Rev. 127, 138–39 (1984); Note, *Constitutional Guarantees*, 49 Iowa L.Rev. at 1205–06. This restriction appears to be absolute only in those few states which also constitutionally forbid any legislative restriction on damages. *See, e.g.,* ARIZ. CONST. art. 18, § 6; KY. CONST. § 54; WYO. CONST. art. 10, § 4. Other states require, in one form or another, a judicial balancing of the individual right to assert a recognized remedy with the public necessity for abrogating or restricting that right.

The elements which are considered in that balance, and the weight accorded to them, vary widely from state to state. Sometimes the elements are simply unclear. *See, e.g., Daugaard v. Baltic Co-Op. Bldg. Supply Ass'n*, 349 N.W.2d 419 (S.D.1984). In most states, however, the courts have articulated the factors to be considered and the weight to be accorded to each.

Thus, in a few states, the balance may be satisfied in favor of the restriction only if the legislature has created an alternative remedy, or quid pro quo, in place of the abolished right. *See, e.g., Ecker v. Town of West Hartford*, 12 Conn.App. 219, 530 A.2d 1056, 1063 (1987) ("where a right existed at common law or by statute in 1818 ... the legislature may restrict or abolish such incorporated right only where it provides a reasonable alternative to the enforcement of such right"); *Gallegher v. Davis*, 37 Del. 380, 392, 183 A. 620, 624, (Del.Super.1936) ("the legislature may not abolish the common law right of action to recover damages for negligent injury without substituting another substantially adequate remedy").

In other states, however, an alternative remedy is only one method of satisfying the balance in favor of the restriction. The standards for determining when another method is sufficient vary from state to state. In Alabama, for instance, a common law remedy may be constitutionally abolished "if the individual possessor receives something in return for it (the individual quid pro quo ...), or if society at large receives a benefit (thereby justifying the exercise of the police power)." *Lankford v. Sullivan, Long & Hagerty*, 416 So.2d 996, 1000 (Ala.1982) (plurality opinion), quoting *Firemen's Fund Am. Ins. Co. v. Coleman*, 394 So.2d 334, 350, 354 (Ala. 1980) (Shores, J., concurring). Judicial review is more rigorous in Utah, where a remedy or cause of action may not be abrogated without providing an alternative unless "there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective". *Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 680 (Utah 1985). Florida is more rigorous still. There the statute must provide "a reasonable alternative to protect the rights of the people of the State to redress for injuries, unless the Legislature can show an overpowering public necessity for the abolishment of such right, and no alternative method of meeting such public necessity can be shown." *Kluger v. White*, 281 So.2d 1, 4 (Fla.1973). Although the standards differ, each of these states recognize that on some occasions the legislative branch may alter or even abolish existing common law remedies.

Like Alabama, Utah and Florida, Texas restricts arbitrary legislative abolition of well-recognized common law causes of action under the open courts provision, while declining to require a quid pro quo whenever common law remedies are changed. I adhere to this interpretation of the open courts provision. I am concerned, how-

ever, that the test now in use by our court obscures rather than illuminates the correct Texas standard.

In *Lebohm v. City of Galveston*, 154 Tex. 192, 199, 275 S.W.2d 951, 955 (1955) (on rehearing), this court articulated the test under our open courts provision as follows:

> [L]egislative action withdrawing common-law remedies for well established common-law causes of action for injuries to one's "lands, goods, person or reputation" is sustained only when it is reasonable in substituting other remedies, or when it is a reasonable exercise of the police power in the interest of the general welfare. Legislative action of this type is not sustained when it is arbitrary or unreasonable.

We quoted and reaffirmed this test in *Waites v. Sondock*, 561 S.W.2d 772, 774 (Tex.1977), and *Sax v. Votteler*, 648 S.W.2d 661, 665 (Tex.1983). In my opinion, it remains the best statement of the true purpose of the open courts guarantee.

After quoting and expressly reaffirming the *Lebohm* standard, however, the court in *Sax* immediately set forth this new test:

> We hold ... that the right to bring a well-established common law cause of action cannot be effectively abrogated by the legislature absent a showing that the legislative basis for the statute outweighs the denial of the constitutionally-guaranteed right of redress. In applying this test, we consider both the general purpose of the statute and the extent to which the litigant's right to redress is affected.

648 S.W.2d at 665–66.[14]

While *Sax* does not necessarily compel an incorrect analysis, in practice it has resulted in an almost exclusive focus on "the extent to which the litigant's right to redress is affected," with an almost total disregard of "the general purpose of the

---

**14.** Later in its opinion, the court again restated the test in slightly different language:

> [T]he litigant has two criteria to satisfy. First, it must be shown that the litigant has a cognizable common law cause of action that is being restricted. Second, the litigant must

show that the restriction is unreasonable or arbitrary when balanced against the purpose and basis of the statute.

648 S.W.2d at 666. It is this statement, and not the holding of *Sax*, upon which the court bases its examination of the malpractice caps.

statute." Except in *Nelson v. Krusen*, 678 S.W.2d 918 (Tex.1984), where the court examined the legislative purpose and effect of the statute in question at some length, the court has emphasized the nature and extent of the restriction to the virtual exclusion of other factors. In *Sax* itself [15], in *LeCroy v. Hanlon, supra*,[16] and in this case, the court's "first concern" has been the absence of adequate substitute remedies.[17] 757 S.W.2d 687. This approach also dominates the other opinions in this case. Justice Culver, in her concurring opinion, notes that the "lack of alternative remedies renders these caps unreasonable and arbitrary when balanced against the purpose and basis of the statute." *Id.* at 701–02. Even in dissent, Justice Gonzalez states that "[l]egislative action withdrawing or restricting a common law remedy will be sustained if it is reasonable in substituting other remedies." *Id.* at 693. He would find the existence of a "societal quid pro quo" to be a sufficient remedy, however, when a common law right is only modified or restricted, and he would make "the existence of an individual quid pro quo a *factor* in determing whether the statutory scheme denying the constitutionally-guaranteed right of redress is reasonable." *Id.* at 693. (Emphasis original).

With all due respect, these approaches all suffer from a common vice: they require this court to strike a delicate balance between important competing interests without any standards for evaluataing the relative importance of those interests. This unfettered discretion leaves us with little other than our personal predilections on which to rely in reaching our decision. One justice therefore finds the cap to be "reasonable", *id.* at 701, the other justices condemn the caps as "unfair and unreasonable", *id.* at 692, or "unreasonable and arbitrary." *Id.* at 701.

I recognize the difficulty in giving meaning to broad constitutional dictates. As Justice Shores said in reference to a nearly identical provision of the Alabama Constitution

Although its language is broad enough to be subject to varying interpretations, it can generally be said to incorporate into our constitution a fundamental principle of fairness, a perhaps vaguely conceived but important notion of limitation on the power of government to infringe upon individual rights, and to act arbitrarily. What those rights are, what degree of infringement is permitted, and with how much justification, are inquiries which have been the subject of long-standing debate.... Underlying all of these inquiries is the oft-unstated but all pervasive question of who is to answer them: legislature or courts? How do

---

**15.** In *Sax*, the court's analysis, in its substantial entirety, was as follows:

[B]oth the purpose and basis for [the statute] are legitimate. Additionally, we recognize that the length of time that insureds are exposed to potential liability has a bearing on the rates that insurers must charge. We cannot agree, however, that the means used by the legislature to achieve this purpose ... are reasonable when they are weighed against the effective abrogation of a child's right to redress....

... This statute effectively abolishes a minor's right to bring a well-established common law cause of action without providing a reasonable alternative. Therefore, we declare the limitations provision ... to be in violation of article I, section 13 of the Texas Constitution.

648 S.W.2d at 667.

**16.** In *LeCroy,* the court stated the *Sax* test as follows:

[T]he general open courts provision test balances the legislature's actual purpose in enacting a law against that law's interference with the individual's right of access to the courts. [Citing *Sax*]. The government has the burden to show that the legislative purpose outweighs the interference with the individual's right of access.

713 S.W.2d at 341.

**17.** In one sentence of its opinion, the court notes: "As did the Supreme Court of Illinois, we reject any argument that the statute may be supported by alleged benefits to society generally." 757 S.W.2d 690. Standing alone, this sentence would seem to indicate that Texas, like Connecticut and Delaware, now requires an alternative remedy whenever established common law actions are restricted. Because the court goes on to examine at some length "whether the restrictions ... are reasonable when balanced against the purposes and bases of the statute," *id.* at 691, however, it seems clear that *Sax* has not been abandoned by the court.

courts supply content to the provision without overstepping their traditional role and legislating themselves? The answers to these questions are important, for too literal a reading of the prohibitions of § 13 may effectively preclude governmental action in areas of crucial public concern; too broad a reading eviscerates the very rights the section was intended to protect.

*Fireman's Fund Am. Ins. Co. v. Coleman,* 394 So.2d 334, 350–51 (Ala.1980) (Shores, J., concurring).

I would, however, return to the language of *Lebohm* to strike the proper balance. That standard correctly separates the issue of a reasonable alternative remedy from the issue of a reasonable exercise of police power. If the Legislature has provided or left in place a reasonable alternative remedy, judicial scrutiny is at an end, and properly so. The Legislature should have absolute discretion to substitute one adequate remedy for another, without its choice being subjected to judicial re-evaluation. If the Legislature has not provided or left in place a reasonable alternative remedy, however, the Constitution requires a second, separate inquiry. The courts must independently determine if the legislative action constitutes a reasonable exercise of the police power.

This determination must be searching. It is not satisfied by a mere finding that the statute is rationally related to a legitimate state interest, for such limited review would give the open courts provision no separate import, at least as to redress, from due course of law. *See LeCroy v. Hanlon,* 713 S.W.2d at 340–41. Rather, I believe it is satisfied only if the statute bears a reasonable relationship to its stated

goal of ameliorating a rationally perceived social evil. A "reasonable exercise of the police power in the interest of the general welfare" thus requires that the statute address an important, not merely a legitimate, state interest, that such interest be perceived and articulated by the state, and that the remedies provided bear a real relationship to the social evil being addressed. These requirements, which are similar to those employed in intermediate equal protection scrutiny, *see* L. Tribe, *American Constitutional Law* 1601–10, and are reminiscent of heightened substantive due process standards, *see State v. Richards,* 157 Tex. at 171, 301 S.W.2d at 602, assure that the right to judicial redress is protected against arbitrary or unreasonable intrusion.[18]

In applying the *Lebohm* standard to the provision under review,[19] the first alternative is quickly resolved. It is apparent that our citizens have long enjoyed the right to sue for unlimited damages for medical negligence, *Graham v. Gautier,* 21 Tex. 111 (1858), and that the cap has not substituted or left in place a reasonable alternative remedy for the rights withdrawn. While some restrictions on remedies may be so insignificant or marginal that the open courts guarantee is not offended, that is not the case with the malpractice cap. Even though our limits are larger than those provided under similar legislation in many other states, they still are substantially beneath what a reasonable finder of facts might award in particular instances. In the case of a permanently and catastrophically injured infant plaintiff like Christopher Lucas, for instance, even the maximum statutory limits would likely constitute inadequate compensation under currently prevailing community mores.[20]

---

**18.** Because of the strong presumption of constitutionality which attaches to a legislative enactment, *see, e.g., Smith v. Davis,* 426 S.W.2d 827, 831 (Tex.1968); *Shepherd v. San Jacinto Junior College Dist.,* 363 S.W.2d 742, 750 (Tex.1962), I would join the court's opinion requiring the party attacking the statute to bear the burden of proof. In one recent opinion however, this court suggested that the "government has the burden to show that the legislative purpose outweighs the interference with the individual's

right of access." *LeCroy v. Hanlon,* 713 S.W.2d at 341.

**19.** While I would reach the same conclusion under the *Sax* standard, I believe, for the reasons set forth above, that *Lebohm* presents a more useful framework for analysis.

**20.** I thus disagree with Justice Gonzalez's suggestion that the difference between a mere restriction and a total abolition of remedies is necessarily of constitutional significance. *See*

It is therefore necessary to proceed to the second alternative of *Lebohm*. Under the appropriate standards for striking the balance under that alternative, I conclude that the cap does not violate the open courts provision.

The cap addressed an important public issue. The Medical Liability and Insurance Improvement Act was our state's response to a national problem of maintaining the delivery of affordable and comprehensive health care to all citizens in light of rapidly increasing insurance costs for health care providers. Forty-eight other states passed some type of legislation during the 1970's in response to this crisis, and twelve of those states also enacted damages limitations. Witherspoon, *Constitutionality of the Texas Statute*, 10 Tex.Tech L.Rev. at 420. The need for available and affordable health care is of critical importance to all people, and the Legislature was addressing an important state interest in enacting this statute.

The Legislature both perceived and articulated this interest in enacting the cap. Two years before the law was passed, the Legislature established the Professional Liability Study Commission. The Commission held hearings, gathered evidence and issued a report to the Legislature, with three members writing separate minority reports. Relying on the Commission's work, the Legislature found a "medical malpractice insurance crisis" in Texas which "has had a material adverse effect on the delivery of medical and health care in Texas," including both "significant reductions of availability of medical and health care services" and an increase in "the cost of medical care both directly through fees and indirectly through services provided for protection against future suits or claims." TEX.REV.CIV.STAT. art. 4590i, § 1.02(a)(5), (6), (9). A detailed explanation of the legislative purpose underlying the statute is set forth in the legislative findings.

Finally, the cap does bear a real relationship to a rationally perceived malpractice crisis. The Legislature found that "the filing of legitimate health care liability claims in Texas is a contributing factor affecting medical professional liability rates." TEX.REV.CIV.STAT. art. 4590i, § 1.02(a)(2). The need to focus on legitimate claims in order to address the problem was explained by the Commission as follows:

> Large verdicts and large settlements constitute a relatively small percentage of the total claims settled or reduced to judgment, probably no more than five percent, but indemnity and allocated losses paid on this small percentage of claims account in excess of 40% of the total damages and allocated expenses paid for all claims. It is therefore apparent that substantial reductions in settlements and judgments in those cases involving severe injuries will have a significant impact on insurance costs and the pure premium rate.

Commission Report at 6. This and all other findings of the Commission were expressly adopted by the Legislature. TEX. REV.CIV.STAT. art. 4590i, § 1.02(a)(13).

Of course, the availability of cheaper insurance would not, standing alone, justify the Legislature's response. Taken to its logical conclusion, this approach would undermine and eventually destroy our system of tort compensation for injured victims and insurance protection for potential tortfeasors. However, contrary to the court's implication, the legislative purpose went far beyond a desire to "protect health care providers from perceived harm." 757 S.W. 2d 705 n. 2.

The primary purpose of the cap was not to protect health care providers, but to protect the public. The Legislature found that "the cost to physicians and hospitals for adequate medical malpractice insurance has dramatically risen in price, with cost

---

*also Rose v. Doctors Hosp. Facilities*, 735 S.W.2d at 248. In my opinion, any significant abrogation, whether total or merely partial, is sufficient to satisfy the first prong of *Lebohm* unless an adequate alternative remedy is provided or

remains in place. *See LeCroy v. Hanlon, supra.* In considering the second prong, however, the availability of partial redress may be of some significance in determining whether the exercise of the police power has been reasonable.

impact on patients and the public," and that "satisfactory insurance coverage for adequate amounts of insurance ... is often not available at any price." TEX.REV. CIV.STAT. art. 4590i, § 1.02(a)(7), (10). The crisis having thus "caused a serious public problem," TEX.REV.CIV.STAT. art. 4590i, § 1.02(a)(11), the Legislature was reasonable in concluding that the cap would make insurance protection available "at reasonably affordable rates," thereby making "affordable medical and health care more accessible and available to the citizens of Texas." TEX.REV.CIV.STAT. art. 4590i, § 1.02(b)(4), (5). The Legislature was reasonable in concluding that cheaper and more widely available insurance coverage would result in greater health care services being provided to more citizens in more areas at more economical charges, all to the public benefit.

The court harshly criticizes the Legislature for its candid conclusion that the cap "may or may not have an effect on the rates charged by insurers for medical professional liability insurance." TEX.REV. CIV.STAT. art. 4590i, § 1.02(a)(12). The court finds it "unreasonable *and* arbitrary to limit [injured plaintiffs'] recovery in a speculative experiment to determine whether liability insurance rates will decrease." 757 S.W.2d at 701. I disagree. In addressing complicated social and economic problems, the Legislature must be free to attempt a remedy, even when the results are uncertain. In the real world, social policy must frequently be made on the basis of incomplete and even conflicting information, and the law of unintended consequences may override even the noblest of intentions. The Legislature should be commended, not condemned, for this realization. To turn constitutionality on the presence of a declaration of certitude might serve only to reward arrogance, ignorance or hypocrisy.

Far from engaging in undisciplined speculation, the Legislature attempted in this instance to meet a complex social problem by limiting damages "in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis." TEX.REV.CIV.STAT. art. 4590i, § 1.02(a)(3). The exclusion of all medical damages from the limits, the inflation adjustment provisions, the limitation on a per defendant rather a per occurrence basis, and the exclusion of *Stowers* claims from the limits all indicate a legislative solicitude for injured claimants. Thus, I find the legislative solution to be reasonably related, or an "acceptable" fit, to a rationally perceived social evil. While the impact on those catastrophically injured persons who are denied full recovery should not be minimized, I believe that the cap is "a reasonable exercise of the police power in the interest of the general welfare." [21]

---

21. Even if the court were correct in striking down the $500,000 non-medical cap, however, I would still maintain that the court erred in striking down the alternative cap of $150,000 on non-economic damages. The damages limited by the principal cap are largely susceptible of arithmetical measurement, and evidence in support and derogation of those damages may be weighed with some degree of certainty by the finder of fact. As to non-economic damages, on the other hand, there is no formula or even definition which has proved useful in their assessment. The appropriate amount is instead left to the discretion, experience and common sense of the finder of fact. *See St. Elizabeth Hosp. v. Gerrard*, 730 S.W.2d 649, 654 (1987); *Green v. Meadows*, 527 S.W.2d 496, 499 (Tex. Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.); *Hernandez v. Baucum*, 344 S.W.2d 498, 500 (Tex.Civ.App.—San Antonio 1961, writ ref'd n.r.e.).

This unscientific process for determining non-economic damages has evoked increasing complaints in recent years. *See, e.g., Seffert v. Los Angeles Transit Lines*, 56 Cal.2d 498, 511, 15 Cal.Rptr. 161, 169, 364 P.2d 337, 345 (1961) (Traynor, J., dissenting); J. Stein, *Damages and Recovery—Personal Injury and Death Actions* 18 (1972). In upholding a $250,000 cap on non-economic malpractice damages, for instance, the California Supreme Court stated:

[I]n seeking a means of lowering malpractice costs, the Legislature *placed no limits whatsoever on a plaintiff's right to recover for all of the economic, pecuniary damages—such as medical expenses or lost earnings—resulting from the injury,* but instead confined the statutory limitations to the recovery of *noneconomic damages....* Thoughtful jurists and legal scholars have for some time raised serious questions as to the wisdom of awarding damages for pain and suffering in any negligence case, noting, inter alia, the inherent difficulties in placing a monetary value on such losses, the fact that money damages are at best only imperfect compensation for such

## II. APPLICATION OF LIMITATION

In answer to the second question certified to us by the Fifth Circuit, I would hold that section 11.02 applies to limit the liability of each defendant rather than the recovery of each claimant. The effect of the provision is apparent from its language, which provides in relevant part:

In an action on a health care liability claim where final judgment is rendered against *a* physician or health care provider, the limit of civil liability for damages of *the* physician or health care provider shall be limited to an amount not to exceed $500,000.

TEX.REV.CIV.STAT. art. 4590i, § 11.02(a). [Emphasis added.] The limitation clearly applies to the recovery against the individual defendant, not the award to the individual plaintiff; thus, a plaintiff who recovers against more than one defendant may secure a judgment in excess of the cap. This interpretation is consistent with the purpose as well as the text of the provision.

This holding is also supported by the court's per curiam opinion on application for writ of error in *Baptist Hosp. of Southeast Texas, Inc. v. Baber*, 714 S.W.2d 310 (Tex.1986). In withdrawing its grant of the application as improvident, the court explained that it was unnecessary to pass on the constitutionality under the facts of the case:

A court will not pass on the constitutionality of a statute if the particular case before it may be decided without doing so. [Citation omitted.] Because the judgment in this case does not exceed the combined statutory *liability of both defendants*, ... the court of appeals need

not have decided this case on constitutional grounds....
714 S.W.2d at 310. [Emphasis added.]

### CONCLUSION

In declaring the medical malpractice caps unconstitutional, I believe the court has substituted its own policy judgment for that of the people acting through their duly elected representatives. The court has struck down a carefully crafted legislative response to a major social problem for no better reason than that it finds the scheme distasteful. Whether the malpractice caps are good social policy or not, I do not find them to be unconstitutional. Hence, I dissent.

intangible injuries and that such damages are generally passed on to, and borne by innocent consumers. While the general propriety of such damages is, of course, firmly imbedded in our common law jurisprudence [citations omitted], no California case of which we are aware has ever suggested that the right to recover for such noneconomic injuries is constitutionally immune from legislative limitation or revision. [Citations omitted].
38 Cal.3d at 159, 211 Cal.Rptr. at 383, 695 P.2d at 680–81. [Emphasis original.]

The limitation on such uncertain and unpredictable damages might substantially increase the availability of affordable insurance coverage with the attending benefits to the public at large, without as devastating an effect on catastrophically injured plaintiffs. I am, therefore, disappointed that the court also found the alternative cap unconstitutional without any separate analysis.